509 A.2d 1179

STATE of Maryland

v.

Richard Danny TICHNELL.

No. 52, September Term, 1985.

Court of Appeals of Maryland.

June 9, 1986.

432

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellant.

Robert L. Morin (Joseph P. Suntum and Thomas L. Heeney, on brief), Rockville, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

MURPHY, Chief Judge.

On August 23, 1979, Richard Danny Tichnell was found guilty by a jury of the wilful, deliberate and premeditated first degree murder of Deputy Sheriff David Livengood. The State sought imposition of the death penalty under Maryland's capital punishment statute, Maryland Code (1957, 1982 Repl.Vol., 1985 Cum.Supp.), Article 27, §§ 412–414, inclusive. Tichnell elected to have the trial judge decide whether the death penalty should be imposed, and the court sentenced him to death. We affirmed the murder conviction on appeal but vacated the death sentence on the ground that it had been imposed under the influence of an "arbitrary factor" in violation of Art. 27, § 414(e)(1). *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980) (*Tichnell I*). On remand for a new sentencing hearing, Tichnell elected to have a jury determine whether the death penalty should be imposed upon him. The jury concluded that death was the appropriate penalty, and on appeal we again vacated the death sentence and remanded for a new sentencing hearing because the trial judge committed reversible error in admitting certain prior recorded trial testimony in evidence over Tichnell's objection. *Tichnell v. State,* 290 Md. 43, 427 A.2d 991 (1981) (*Tichnell II*). At his third capital sentencing hearing, Tichnell again elected to be sentenced by a jury. The jury imposed the death penalty and on appeal we affirmed. *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (*Tichnell III*).

Tichnell then filed a petition for post conviction relief in the Circuit Court for Calvert County, pursuant to the Uniform Post Conviction Procedure Act, Maryland Code (1957, 1982 Repl.Vol., 1985 Cum.Supp.), Art. 27, §§ 645A through J. In his petition, Tichnell raised fifteen claims for relief, asking for both a new trial on the merits and a new sentencing hearing. The court (Melbourne, J.) denied relief on fourteen claims but granted Tichnell a new sentencing hearing on his claim that he did not receive effective assistance of counsel during the third sentencing procedure. We

granted the State's application for leave to appeal from the court's order granting Tichnell a new sentencing hearing. We also granted Tichnell's application for leave to appeal from the court's order denying relief on all of the other grounds asserted in the petition.

## I.

At the outset of the post conviction hearing before Judge Melbourne, the transcripts and exhibits in each of the prior *Tichnell* cases were received in evidence. They disclosed that at approximately 5:25 a.m. on January 18, 1979 Tichnell and a confederate, Oscar Recek, broke into Davidson's store in Oakland, Maryland, for the purpose of stealing some handguns. At that time a silent alarm sounded in the nearby sheriff's office and Deputy Sheriff David Livengood, accompanied by a K–9 dog, immediately drove to the scene. Officer Roger Lewis of the Oakland Police Department also responded.

Officer Lewis arrived at the store at approximately 5:27 a.m. The store was located between parallel Routes 219 and 4, having its entrance on Route 219 and its rear door 252 feet from Route 4. Lewis noticed that the front door of the store had been broken open and he entered the store a minute or so after he arrived. Between 5:28 a.m. and 5:31 a.m., Deputy Livengood contacted Officer Lewis by police radio. He asked Lewis to remain in his car in front of the store and told him that he was proceeding to investigate a "suspect vehicle" located behind the store.

James Wolfe, whose house overlooks Route 4, was leaving for work between 5:30 and 5:35 a.m. when he heard some yelling on the road. From approximately 460 feet away, he observed a car facing north, stopped on Route 4, with its headlights on and a dog pacing back and forth in front of the headlights. After about 10 seconds the dog disappeared, and 15 seconds later Wolfe heard a burst of shots, followed by a split second pause and then the sound of tires spinning coupled with a simultaneous second burst

of shots. Wolfe then saw a faint vision of a second car, without headlights, move in a southerly direction on Route 4 about 20 to 30 feet after which he heard a "thump." Wolfe went into his house and called the sheriff's office at about 5:37 a.m. After a few minutes, Wolfe noticed a vehicle with headlights leave the area. At 5:50 a.m., Wolfe drove on Route 4 behind Davidson's store and observed Deputy Livengood lying facedown at the edge of the northbound lane. He promptly notified the sheriff's office and Officer Lewis, who had remained at the front of the store as instructed, and others immediately responded.

Deputy Livengood had been shot seven times and was dead. His service revolver with three live and three spent cartridges was located under his body. A pair of handcuffs was found on the road about 23 feet from Livengood's body. The deputy's police cruiser was missing. His K–9 dog was lying off the road about 26 feet from Livengood's body. The dog had been stabbed in the left shoulder region; it died shortly thereafter. A car belonging to Tichnell was found in a snow-filled ditch partially off of Route 4 facing south about 40 feet from the deputy's body. Two bullet holes were observed in Tichnell's car, one at the left front door near the door lock and the other at the left front area of the doorpost. A 9 millimeter Browning semiautomatic pistol belonging to Tichnell, and later identified as the murder weapon, was found in the front seat of Tichnell's abandoned car. The gun contained seven empty shells and seven loaded cartridges. Two of the spent cartridges were found on the floor of Tichnell's car behind the driver's seat. The other five casings were found scattered on Route 4 in a cluster near Livengood's body.

Tichnell and Recek were arrested later that morning in West Virginia. They were driving a vehicle which Tichnell had commandeered after wrecking the deputy's cruiser in the course of their flight from the scene of the shooting. A bag containing guns stolen from Davidson's store and a samurai sword with dog blood and hair on it were found in the vehicle. Also in the car was a shoulder holster capable

of holding a Browning semiautomatic pistol. The holster was stained with blood of a type matching Tichnell's. Tichnell had a gun shot wound in his right shoulder, a laceration over his right eye and a crushed tooth.

On the evening of his arrest, Tichnell gave the West Virginia State Police a statement admitting that he and Recek had broken into Davidson's store and stolen guns. He said that they were in the store about 3 to 5 minutes and were returning to their car when Recek said that he had lost a loaded .38 Smith and Wesson revolver which Tichnell had given him just before they broke into the store. Since this was the same gun that Tichnell had stolen 3 days earlier from Davidson's store and had his fingerprints on it, Tichnell directed Recek to go back and find it. To avoid detection in the interim, Tichnell said that he drove around the Oakland area to give Recek time to find the lost gun. Tichnell told the police that he returned to Route 4, moving in a southerly direction, to pick up Recek when Tichnell saw a police cruiser facing north blocking his lane. At this moment, Tichnell said that his car headlights, which had been defective for some time, went out. He observed that the officer, gun in hand, had apprehended Recek and had him lying on the ground. Tichnell said he stopped his car about 15 to 20 feet from the police car and got out to repair his headlights. At this time, the officer pointed his weapon at him and told him to lie down on the road. Tichnell complied and he heard the deputy order his K–9 dog to watch him. The dog stood over Tichnell and as he looked up the dog bit him on the side of his eye and through the inside of his mouth. Tichnell said that he screamed out with pain, became hysterical, and started running around in circles to avoid the dog. Since he believed the dog had torn his eye out, Tichnell ran to his car to get a medical kit which he kept in the back seat.

At this point Tichnell heard the deputy order the dog to watch Recek and the deputy followed Tichnell to his car, spun him around and placed a gun in his face. The door on the driver's side of Tichnell's two-door car was open. Tich-

nell said he moved the deputy's weapon from his face and requested that he be allowed to tend to his wounded eye. The deputy put his gun against Tichnell's shoulder and shot him from a distance of about a foot and a half. Tichnell said that the shot knocked him into his car and that he grabbed the barrel of the deputy's gun as he fell. While still holding the deputy's gun, Tichnell said he reached for his own gun which he kept under the front seat. As the scuffle continued, the deputy fired again, the bullet narrowly missing the top of Tichnell's head. Tichnell explained that because he thought the deputy was going to shoot him again, he fired four to five shots at the deputy at point-blank range. He said that the first shot struck the deputy in the head, and he was certain that he was dead.

Tichnell acknowledged in his statement that he and Recek attempted to leave the scene in Tichnell's car. After moving about 30 or 40 feet, Tichnell said that the car slid on the ice and went off the road and into a ditch. He then decided to take the deputy's cruiser, but found the dog sitting in the front seat. As Recek attempted to get in the open door of the car, the dog lunged at him. Tichnell thereupon removed a samurai sword from his car and stabbed the dog behind its left shoulder. The dog rolled out of the car when he withdrew his sword. Tichnell stated that he and Recek then fled in the cruiser but subsequently wrecked it. They then obtained another vehicle and continued their flight into West Virginia.

Other evidence revealed that of the seven shots fired into Deputy Livengood's body, two were fatal. The first of the fatal shots was to the lower back and the second was in the back of the head. No powder burns were found on the clothing or upon the wounds of Tichnell or Livengood. The State produced testimony that had the shots been fired at a range less than 3 feet, burned powder residue would have been found on the clothing or wounds of both the deputy and Tichnell. The expert witness concluded that the shots were fired at a distance greater than 3 feet. Evidence produced by the State that Tichnell's bloody shoulder hol-

ster was recovered at the time of the arrest was intended to establish that Tichnell was wearing the holster at the time he was shot in the shoulder and carried his Browning pistol in it earlier when he broke into the store. There was evidence that Tichnell's blood type was found on broken glass fragments from the windshield of the deputy's cruiser, suggesting that the lacerations over Tichnell's eye and his crushed tooth may have occurred at the time Tichnell wrecked the cruiser. According to one of the arresting troopers, when Tichnell was first arrested he attributed the cut on his eye to the car accident and did not mention a dog bite. Evidence was also introduced to show that, in view of the time involved between the break-in at the store and the shooting, Tichnell could not have traversed the 2.3 mile route around Oakland which he said he had taken while waiting for Recek to find the missing gun. Also introduced into evidence was Tichnell's medical aid kit which, unlike the stolen guns and samurai sword, had been left behind in Tichnell's car when he fled in the deputy's cruiser.

Recek did not testify at the original trial or the two subsequent sentencing hearings; however, he did testify at the third sentencing hearing. In the course of his testimony, Recek acknowledged entering Davidson's store with a loaded gun given him by Tichnell. He also acknowledged returning to the store to find the lost gun. While returning from the store through a field between the store and Route 4, he saw the taillights of Tichnell's car on Route 4, being followed by a police cruiser. Recek testified that the police car stopped when the officer saw him in the field; that it then turned around and that, as he did so, Tichnell circled the area in his vehicle. Recek said that he was about 10 feet from Route 4 when the deputy, accompanied by his K-9 dog, with gun in hand and handcuffs out, told him he was under arrest and to lie on the ground. After obeying this command, Recek said he observed Tichnell's car on Route 4 with its headlights blinking on and off. He testified that he saw Tichnell approach the deputy and speak with him; that the deputy ordered Tichnell to lie on the

ground and directed the K–9 dog to guard him; that shortly thereafter Tichnell screamed out that the dog had bit him on the eye and that he was blind; that Tichnell shouted that he was going to his car to get a medical kit; and that at this point Livengood ordered the K–9 dog to leave Tichnell and to guard Recek. From his position on the ground, with the dog barking in his face, Recek said he caught only a "glimpse" of what next occurred; that Livengood and Tichnell left his sight and he next heard a burst of shots as the two men approached the side of Tichnell's car, after which he observed Livengood "back tracking" and fall on the ground. Recek said that immediately after the shooting Tichnell said that he "outdrew" the deputy; that it was "He or me"; that he had no choice; and that, in addition, he had to kill the dog "or he would have got me." Recek also acknowledged that he had been convicted of the first degree felony murder of Deputy Livengood in a separate trial and sentenced to life imprisonment.

Tichnell's testimony at each resentencing hearing was generally consistent with his statement to the police on the evening of his arrest. Additionally, he testified that he knew a silent alarm had been triggered when he broke into Davidson's store and also knew that an officer would be on his way to the scene within 2 to 5 minutes. Tichnell testified that while he was unarmed at the time he entered the store, he had given Recek a loaded revolver to carry into the store. He testified that his shoulder holster was under the seat of his car at the time of the shooting; that after the shooting he put his Browning pistol in the holster with the intention of taking it with him in the deputy's car as he fled the scene; that the gun must have slipped out of the holster, remaining in Tichnell's abandoned car; that he nevertheless wore the holster without his gun after the shooting occurred. At another point, Tichnell testified that the muzzle of Livengood's gun was pressed against his shoulder when Livengood fired the first shot.

## II.

Tichnell's privately retained counsel in each of the three prior cases was Clark B. Frame of Morgantown, West Virginia, a city approximately nineteen miles from where Tichnell resided in Fairmount, West Virginia. Frame was recommended to Tichnell's mother as a competent criminal law practitioner by another West Virginia lawyer.

Following the unsuccessful result in *Tichnell III*, Frame was discharged from further representation and the Public Defender entered the case as Tichnell's new counsel. As earlier indicated, the Public Defender filed a petition for post conviction relief alleging, in a number of particulars, that Frame rendered ineffective assistance to Tichnell both at the guilt or innocence stage of *Tichnell I* and at the resentencing hearing in *Tichnell III*.

### A.

Under the Sixth Amendment to the Constitution of the United States the accused in all criminal cases is entitled "to have the Assistance of Counsel for his defense." *Argersinger v. Hamlin*, 407 U.S. 25, 27, 92 S.Ct. 2006, 2007, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright*, 372 U.S. 335, 339, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). There is no distinction between the right to counsel guaranteed by the Sixth Amendment and Art. 21 of the Maryland Declaration of Rights which declares " 'That in all criminal prosecutions, every man hath a right ... to be allowed counsel....' " *Harris v. State*, 303 Md. 685, 695 n. 3, 496 A.2d 1074 (1985).

In *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970), the Supreme Court said "that the right to counsel is the right to the effective assistance of counsel." In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a death penalty case, the Supreme Court considered the proper standard for judging a criminal defendant's contention that counsel's assistance was so defective as to require the reversal of a conviction or death sentence. In its

analysis, the Court said: "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064. A two-part test was articulated in *Strickland, i.e.,* that to establish a claim of ineffective assistance of counsel the defendant must show both that (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. To establish that a deficiency existed, *Strickland* requires that the defendant show acts or omissions by counsel that are the result of unreasonable professional judgment and that counsel's performance, given all the circumstances, fell below an objective standard of reasonableness considering prevailing professional norms. Moreover, the defendant must overcome a presumption that the alleged acts or omissions might be the result of sound trial strategy. Under its deficiency component, *Strickland* recognized several duties owed by counsel to the defendant. Most notable among these is the duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066.

The prejudice component of *Strickland* "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. Accordingly, as we said in *Harris, supra,* 303 Md. at 700, 496 A.2d 1074, citing *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2068, it is not enough for the defendant merely "to show that the errors had *some conceivable effect* on the outcome of the proceeding, or that the errors *impaired* the presentation of the defense." (Emphasis in original.) The burden is on the defendant to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Furthermore, a reasonable probability is " 'a probability sufficient to undermine confidence

in the outcome.' " *Id.* Specifically, the question involved
when a death sentence is challenged under the prejudice
component "is whether there is a reasonable probability
that, absent the errors, the sentencer—including an appel-
late court, to the extent it independently reweighs the
evidence—would have concluded that the balance of aggra-
vating and mitigating circumstances did not warrant
death." *Id.* at 695, 104 S.Ct. at 2069.

*Harris v. State,* 303 Md. 685, 496 A.2d 1074 (1985) was a
death penalty case involving, as here, an ineffective assist-
ance of counsel claim in which we evaluated defense coun-
sel's performance under the standards set forth in *Strick-
land's* two-pronged test. Writing for the Court, Judge
Orth extensively analyzed the teaching of *Strickland,* not-
ing that "[b]oth the performance and prejudice components
of the ineffectiveness inquiry are mixed questions of law
and fact." 303 Md. at 696, 496 A.2d 1074. We pointed out
that under the deficiency component *Strickland* requires,
among other things, that counsel bring to bear such skill
and knowledge as will render the trial a reliable adversarial
process. *Id.* Under the prejudice component, we quoted
from *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2067, that
" 'An error by counsel, even if professionally unreasonable,
does not warrant setting aside the judgment of a criminal
proceeding if the error had no effect on the judgment. . . .
[A]ny deficiencies in counsel's performance must be preju-
dicial to the defense in order to constitute ineffective assist-
ance under the Constitution.' " *Harris,* 303 Md. at 699, 496
A.2d 107. We noted that a heavy burden of proof rests
upon the defendant to prove both deficient performance and
prejudice, and that an appellate court reviewing an ineffec-
tiveness of counsel claim must make an independent consti-
tutional appraisal from the entire record. *Id.* at 697, 496
A.2d 107 and cases there cited. The appellate court, we
said, is not a finder of facts nor does it judge the credibility
of the witnesses or initially weigh the evidence to determine
the facts underlying the constitutional claim. *Id.* at 698,
496 A.2d 107. Rather, it is the function of the trial court to

ascertain the circumstances on which the constitutional claim is based so that

> "in making our independent appraisal, we accept the findings of the trial judge as to what are the underlying facts unless he is clearly in error. We then re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed." *Id.* at 698, 496 A.2d 107.

We said that *Strickland* details the nature of the inquiry to be made by a reviewing court upon its independent appraisal with respect to an ineffectiveness claim. We summarized *Strickland's* standards, as follows:

> " '(a) [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

> (b) The court must then determine whether, in light of all the circumstances, the acts or omissions identified by the defendant were outside the wide range of professionally competent assistance.

> > (i) In making that determination, the court should keep in mind that counsel's functions, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

> > (ii) At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Id.* at 698–99, 496 A.2d 107.

In *Harris,* we noted *Strickland's* observation that the object of an ineffectiveness claim is not to grade counsel's performance but rather courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result. *Id.* at 701, 496 A.2d 107. In so concluding, we footnoted at 698–99, 496 A.2d 107 several cogent comments

from *Strickland.* First, that the reviewing court in its scrutiny of counsel's performance must reconstruct the circumstances of his alleged conduct and evaluate that conduct from his perspective at that time, eliminating all the distorting effects of hindsight. "It is all too tempting," the Court said, "for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689, 104 S.Ct. at 2065. Second, the availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

## B.

At the jury sentencing hearing in *Tichnell III,* the State introduced its version of the circumstances under which Deputy Livengood was murdered by Tichnell. Thereafter, Frame called Tichnell, Recek, Tichnell's mother and two forensic experts to testify. Recek's testimony, as previously indicated, was produced for the purpose of corroborating Tichnell's version of the shooting. Tichnell's own testimony concerning the immediate circumstances surrounding the shooting was consistent with his earlier statement to the police at the time of his arrest and to his testimony at the prior trials. Prior to Tichnell's testimony concerning the shooting, Frame questioned him about his personal life in an effort to place him before the jury in as favorable a light

as possible. Tichnell testified that he graduated from high school in 1966. Later, he was married and joined the army where he was trained as a "medical specialist" in the Special Forces, receiving a general discharge under honorable conditions. He told the jury that he had a son, Peter Shawn Tichnell, who was at the time of the hearing eight years old and about to enter the second grade. He related that he had worked in his mother's jewelry store for approximately nine years. He said that after his army service, he worked for Sharron Steel for about eight years until he lost his job when the plant closed in 1978. Tichnell said that after losing his job at the steel plant he held odd jobs, and that he enjoyed cross-country skiing for recreation.

Tichnell also testified as to his activities in the hours preceding the shooting. He said that he had been drinking at two bars. At the first bar he drank about a gallon of beer. At the second he had five Vodka based "black russian" mixed drinks. He and Recek then proceeded to Davidson's store.

Tichnell's testimony stressed that he was hysterical at the time of the shooting after being bit in the eye by the deputy's K-9 dog and that he had gone to his car to get his medical bag to treat his eye when the deputy stopped him and shot him in the shoulder.

Tichnell also testified that since his conviction he had been working as a clerk for the maintenance department and power plant of the Maryland Penitentiary in Baltimore. He further testified that he had taken college courses and received a Bachelor of Arts degree while in prison. Lastly, Tichnell expressed remorse for the shooting and asked the jury to spare his life.

Tichnell's mother, Verna Tevers, testified generally about her son's background, saying that his father left her when Tichnell was still an infant; that he was an only child; that Tichnell worked part time in a pawn shop she owned; that her second husband had been dead for ten years; that at the time of the shooting her son was having marital prob-

lems and was in the process of moving out of his house. Lastly, she expressed sorrow for what had happened and begged for her son's life. Crying before the jury, Tevers said: "Please give him his life. He is all I have."

The forensic experts' testimony was for the purpose of explaining to the sentencing jury why there were no powder burns on Tichnell's and the deputy's clothing.

In his opening statement at the third resentencing hearing, Frame separately reviewed all eight mitigating factors in § 413(g). He noted that Tichnell had no prior criminal record and therefore had to receive the benefit of the first statutory mitigating factor. § 413(g)(1). Among the seven listed mitigating circumstances, Frame placed particular emphasis on the third, fourth and sixth. He maintained that Tichnell acted "under substantial duress, domination or provocation," as set forth by § 413(g)(3), because he had been bitten in the eye by the dog and shot in the shoulder by Deputy Livengood. Frame said that the fourth statutory mitigating circumstance applied in that Tichnell had consumed a substantial amount of alcohol shortly prior to the shooting, thereby substantially impairing his capacity to appreciate the criminality of his conduct. § 413(g)(4). As § 413(g)(6) provides that it is a mitigating circumstance if "the defendant was not the sole proximate cause of the victim's death," Frame maintained that there were "a multiple number of causes including an inadvertent dog attack." As § 413(g)(8) provides that any other circumstances not specifically listed may be determined by the jury to be mitigating factors, Frame urged that the jury find that Tichnell's drinking prior to the shooting and his domestic marital problems constituted mitigating circumstances.

In his closing argument, Frame conceded Tichnell's guilt, saying "there is no argument about him being innocent." But because Tichnell had been bitten by the dog, shot by the deputy, and was confused and in pain, Frame contended that the circumstances surrounding the shooting were not

so heinous as to call for the death penalty. Specifically, Frame argued before the jury:

"[Tichnell] is not armed and he is attacked by a dog and he is bitten and he's shot and he's bewildered and he is in pain and he is confused and he's in a situation with an Officer and you don't have to tell me, I agree with you before you tell me and think it, he brought it on. He brought it on and I agree with you. And so we can't say Richard, you made a mistake and we're going to send you back innocent to your family. We can't do that. But in those totality of circumstances, under those circumstances when a life is taken, isn't it in such a contrast with those heinous, bizarre, macabre, inexcusable, mind boggling crimes that really call for the Death Penalty where one has a deliberation, one it's like a murderer that goes out like a contract killer and lays behind a stone wall with a high powered rifle...."

## C.

At the post conviction proceeding, the Public Defender, in an effort to demonstrate that Frame was constitutionally ineffective in *Tichnell III,* adduced evidence that he claimed should have been produced by Frame to satisfy Tichnell's Sixth Amendment right to the effective assistance of counsel. Introduced in evidence were a number of affidavits and depositions of individuals residing in Tichnell's hometown, including neighbors, the county sheriff, relatives, a former policeman, and a lawyer. This evidence generally depicted Tichnell as a normal, well-behaved and nonviolent person. Live testimony to this effect was adduced from one of Tichnell's closest boyhood friends. Tichnell's mother also testified that Frame never asked her about her son's background, or inquire of her as to any individuals to whom he should speak in ascertaining her son's character. She testified in extensive detail concerning her son's background, emphasizing emotional stress which he suffered as a result of a poor relationship with his stepfather and his broken marriage. A prison counselor testified that Tichnell

was a model inmate who performed one of the most trusted jobs in the penitentiary. Dr. Neil H. Blumberg, a psychiatrist, testified that Tichnell suffered from several mental disorders including, dysthymic disorder, alcohol abuse disorder, mixed substance abuse disorder and mixed personality disorder. In his opinion these disorders substantially impaired Tichnell's judgment and overall emotional functioning. The basis for Dr. Blumberg's opinion was information gained from a review of Tichnell's personal records and the depositions and affidavits of whose who knew him. He said that Tichnell was an only child whose parents separated before his birth; that his real father, whom he never knew, had been an alcoholic and gambler; that he was left to the care of strict grandparents for many of his early years; that his grandparents lived on an isolated farm, leaving Tichnell lonely; that, although there was no record of physical abuse, his stepfather abused him emotionally; and that he failed out of college after a car accident in which a friend was killed; and that he abused alcohol. Dr. Blumberg indicated, however, that Tichnell did not lack substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Lawrence Donner, a clinical psychologist, testified as to the results of his psychological testing of Tichnell in 1984 at the penitentiary. He concluded that Tichnell was an all-American boy type who presented himself as a "superman" with "no emotional difficulties, no problems" and as being "very closely in touch with reality." Nevertheless, according to the witness, Tichnell underwent a significant personality change beginning in 1968, largely as a result of his traumatic marriage. Donner indicated that Tichnell became depressed at that time; that his personality deteriorated and he began drinking and taking drugs; and that he was emotionally impaired and because he could not deal with anger and emotions, he would avoid confrontation, his personality traits being inconsistent with those of a violent person.

The Public Defender next produced a Georgia lawyer who had tried a number of capital cases throughout the South and who claimed to be an expert consultant in death penalty litigation. He testified that he had reviewed the Tichnell transcripts and had interviewed available witnesses who could have been called in mitigation of punishment. He concluded that Frame's failure to investigate Tichnell's background and to "humanize" him by calling such witnesses amounted to ineffective assistance of counsel under the prevailing professional norms.

Frame testified at the post conviction hearing. He indicated that his strategy in *Tichnell III* was to convince a new sentencing jury that, while Tichnell was convicted of first degree murder, given the circumstances surrounding the shooting the death penalty was simply unwarranted. He said:

"My defense in the case, and I fervently believe it to this day, was that as [Tichnell] was lying on the road in an inch of snow, the coldness caused him to shake his head. When he shook his head a dog grabbed him by the eye and jaw, fracturing a tooth and enucleating one eye. That he then ran to his car to get a medical aid bag, and announced the same. That when he did so, he was grabbed by the police officer, spun around against the car and shot through the shoulder. At that time he grabbed his 9 millimeter Browning semiautomatic pistol and fired approximately seven shots at the officer in a fusillade, which resulted, unfortunately, in the officer's death.

"I believed then, as I believe now, that there was not premeditation in the sense such that would dictate the death penalty."

Frame testified that he had thirty years of experience and had devoted much of his practice to the criminal law, having tried "dozens and dozens" of cases involving the offenses of noncapital murder and manslaughter. He said:

"[I]t is my belief—honest belief and judgment that good character evidence is not helpful, particularly unless you have a Defendant where you can get truly outstanding

character witnesses, such as State Senators or judges. It doesn't do any good just to ... bring a preacher in and say, 'Yes, he is a good boy.' "

When questioned as to why he chose not to present psychological evidence, Frame testified that he was personally "impressed" with Tichnell because of "his appearance and the way he talks, his politeness, his lucidity," and "his intelligence" which Frame said were "impressive to anybody that's around him."

### D.

Judge Melbourne found Frame's performance at the resentencing in *Tichnell III* to be constitutionally ineffective in several particulars which contributed to the imposition of the death penalty. The court observed that Frame's strategy in *Tichnell III* was to present evidence to corroborate Tichnell's version of the crime so as to cast doubt upon his guilt and refute the State's theory that he had ambushed and murdered Deputy Livengood. Judge Melbourne concluded that Frame did not render effective assistance of counsel in *Tichnell III* in that he failed to investigate Tichnell's background, to call character and other mitigating witnesses on his behalf, to present psychiatric evidence to establish that Tichnell suffered from mental disorders and psychological stresses, and that he misunderstood the law relating both to character evidence and mitigation of punishment under Maryland's death penalty statute. As to Frame's failure to produce character witnesses, the court found from his own testimony at the post conviction hearing that he labored under the mistaken belief that if good character evidence were introduced it would "open the door" for the prosecution to cross-examine as to specific acts of misconduct on Tichnell's part which did not result in convictions.

In so concluding, the post conviction court, while citing *Strickland,* made no analysis of the constitutional standards set forth in that case for determining whether counsel rendered ineffective assistance to Tichnell. Instead, it

relied upon the pre-*Strickland* cases of *Ward v. State,* 52 Md.App. 88, 447 A.2d 101 (1982) and *State v. Lloyd,* 48 Md.App. 535, 429 A.2d 244 (1981) as containing the law applicable to Tichnell's claim of ineffective assistance of counsel. The post conviction court noted that under *Ward* a three-step analysis was required, *i.e.:*

> "First, it must be determined whether counsel erred. Second, if error exists, then the court must look to the reason for counsel's action. Certain action may be justified if it was undertaken as a trial tactic rather than out of ignorance of the law. And third, if counsel committed error and it was not justified, then he was ineffective if his incompetence contributed to the conviction." (Citations omitted.)

### III.

We think Judge Melbourne erred in holding that Tichnell was denied his Sixth Amendment right to the effective assistance of counsel at resentencing in *Tichnell III.*

At the outset of his representation of Tichnell, Frame was confronted with a statement that Tichnell had made to the police upon his arrest, giving a detailed version of the circumstances under which Deputy Livengood was shot and killed. Frame's defense of Tichnell was thus restricted from the beginning by Tichnell's own particularized account of the shooting—a version from which Tichnell never deviated. As the officer was shot seven times, twice fatally in the back, and as Tichnell had fled the scene immediately after the shooting, and was captured by the police while in flight, Frame was presented with a difficult case to defend of premeditated first degree murder of great societal concern—the killing of a police officer in the performance of his duties. The strategy that Frame settled upon was self-defense and, failing that, to negate Tichnell's guilt of premeditated first degree and ultimately, if necessary, to convince the sentencing authority that, in view of all the

facts and circumstances, the crime was not of such gravity as to call for imposition of the extreme penalty of death.

We think Judge Melbourne was wrong in concluding that Frame did not appreciate the distinction between mitigation as applied to the substantive law of murder, and mitigation as applied to punishment at a death sentencing hearing. It is readily evident from the transcripts of the three *Tichnell* cases that Frame understood the concept of mitigation of punishment and the manner in which the mitigating factors outlined in the death penalty statute applied and operated in the capital sentencing process. That Frame sought to minimize the gravity of the homicide, even though Tichnell had been convicted of premeditated first degree murder, was manifestly not to exonerate him from guilt for the offense, or to reduce the murder to one of lesser degree, but solely to persuade the sentencing jury that the circumstances under which the offense was committed warranted a sanction less than death.

Nor did Frame's decision not to call character and other witnesses in *Tichnell III* in mitigation of punishment, including psychiatric and psychological experts, amount here to deficient performance under *Strickland*. Frame's decision to limit his witnesses at *Tichnell III* to Tichnell, his mother, his confederate Recek and several forensic experts did not, in the circumstances, constitute unreasonable professional judgment falling below an objective standard of reasonableness, considering prevailing professional norms. Frame had represented Tichnell at the original trial, at three sentencing hearings, and upon three appeals. That he knew a great deal of Tichnell's history and background is plainly reflected in the record; indeed, following *Tichnell I*, a detailed post-sentence report pertaining to Tichnell's family and other background was prepared by the Division of Parole and Probation and is part of the record in this case. The report indicated that the investigator had gone to Tichnell's hometown and spoken with individuals who knew him, some of whom were "shocked" that he had been involved in the killing of a police officer. The report

revealed that Tichnell was of normal intelligence, that he came from a family of better than average circumstances, that his early years were largely uneventful, that there were both favorable and unfavorable incidents in his life, and that he had never been incarcerated. The report indicated, however, that Tichnell's character rapidly deteriorated after his marriage in 1968 when he began to drink excessively, take illegal drugs and associate himself with antisocial companions. An account of Tichnell's efforts to obtain membership in the notorious Pagan motorcycle club shortly before Deputy Livengood's murder was also included in the report.

While Frame may have erroneously believed that the presentation of character evidence would have "opened the door" to prosecution evidence showing specific acts of misconduct by Tichnell other than convictions, the record reflects that Frame's overriding reason for not presenting further character evidence was his belief that it would not have been effective or in furtherance of his basic strategy of convincing the jury that the circumstances under which the crime was committed did not call for imposition of the death penalty. Indeed, most of the character evidence produced at the post conviction hearing was from friends of Tichnell's mother who had little contact with or knowledge of Tichnell's character after his 1968 marriage, more than ten years prior to the murder in this case. And, as reflected in the post-sentence report, Frame may well have believed that Tichnell's background history could not be beneficially focused upon as a mercy-evoking mitigating reason for the jury to impose a life rather than a death sentence.

■ The psychiatric and psychological evidence produced at the post conviction hearing indicated little more than that Tichnell had a difficult childhood and marriage and that, at the time of the shooting, he was suffering from various mental stresses and disorders, none of which caused him to lack substantial capacity to appreciate the criminality of his

conduct or to conform it to the requirements of the law. That Frame did not pursue or present such evidence to the sentencing jury does not in the circumstances of this case constitute ineffective assistance of counsel. In view of Tichnell's demeanor, statements and actions, Frame had no reason to believe that he was suffering from any mental disease or disorder at the time of the crime or that the presentation of this type of evidence would, consistent with his trial strategy, have utility in convincing the jury not to impose a death sentence.

In *Strickland,* as here, the claim was made upon collateral attack of a death sentence that counsel was constitutionally ineffective for failing to investigate the case and present character witnesses and psychiatric evidence in furtherance of counsel's efforts to avoid a death sentence. In support of these claims, evidence was introduced from prospective character witnesses, as well as psychiatric and psychological reports, indicating, among other things, that the defendant was frustrated and depressed at the time he committed the murders because of his inability to support his family. The evidence showed that defendant's counsel limited his investigation of the defendant's background to a conversation with him, and with the defendant's mother, and did not request a psychiatric examination, as he saw no indication that the defendant suffered from mental problems. In finding no denial of the Sixth Amendment right to the effective assistance of counsel, the Supreme Court concluded that such evidence was inconsistent with counsel's strategy to have the defendant accept responsibility for his crimes, to avoid psychiatric excuses, to present the defendant as a good person without prior history of criminal activity, and to show that the defendant committed the crimes while under extreme stress. The Supreme Court noted that "counsel made a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes." *Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070. This choice of strategy, the Court said,

"was well within the range of professionally reasonable judgment," *id.*, and that, in any event, there was no reasonable probability that the omitted evidence, had it been introduced, would have resulted in a life sentence.

Similarly, in *Harris v. State, supra,* where a death sentence was imposed following a guilty plea, we concluded that in the circumstances counsel was not constitutionally ineffective under *Strickland* for failure to investigate the facts of the case, to order a psychiatric examination, or to talk to the defendant's father prior to the sentencing hearing. There, as here, a full report of the Division of Parole and Probation concerning the defendant's history and background was part of the record. We concluded that the facts known to the defendant's counsel eliminated the need for further investigation and that there was nothing to indicate to counsel that the defendant was not responsible for his criminal conduct because of mental disability. Other post-*Strickland* death penalty cases have applied *Strickland* standards in rejecting claims of ineffective assistance of counsel, based in part on failure to investigate or to call witnesses in mitigation of punishment. *See, e.g., Milton v. Procunier,* 744 F.2d 1091, *reh'g en banc denied,* 750 F.2d 69 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Tyler v. Kemp,* 755 F.2d 741, *reh'g en banc denied,* 765 F.2d 154 (11th Cir.), *cert. denied sub nom. James v. Tyler,* —— U.S. ——, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985); *Mitchell v. Kemp,* 762 F.2d 886, *reh'g en banc denied,* 768 F.2d 1353 (11th Cir.1985); *Burger v. Kemp,* 753 F.2d 930 (11th Cir.), *vacated on other grounds,* —— U.S. ——, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985); *Briley v. Bass,* 750 F.2d 1238 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985); *Griffin v. Wainwright,* 760 F.2d 1505, *reh'g en banc denied,* 770 F.2d 1084 (11th Cir.1985), *petition for cert. filed,* 54 U.S.L.W. 3487 (U.S. Oct. 16, 1985) (No. 85–801); *Knighton v. Maggio,* 740 F.2d 1344 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984); *Moore v. Maggio,* 740 F.2d 308, *reh'g en banc denied,* 744 F.2d 94 (5th Cir.1984), *cert. denied,* ——

U.S. ——, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985); *Green v. Zant,* 738 F.2d 1529, *reh'g en banc denied,* 744 F.2d 97 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); *People v. Lewis,* 105 Ill.2d 226, 473 N.E.2d 901 (1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985); *Stokes v. State,* 688 S.W.2d 19 (Mo.Ct.App.1985).

■ We recognize, of course, that each case alleging ineffective assistance of counsel necessarily depends on its own facts. In the present case, applying the heavy measure of deference to Frame's judgment demanded by *Strickland,* and presuming, as that case requires, that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, we think Frame's decision not to pursue the character and psychiatric evidence in question did not constitute deficient performance. On the record in this case, Frame met his obligation "to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. His representation of Tichnell was not shown to be outside of the range of professionally reasonable judgment; therefore, Tichnell did not meet his burden of establishing that Frame's performance was deficient under the constitutional test articulated in *Strickland.* In so concluding, we have made the requisite independent constitutional appraisal from the record, accepting Judge Melbourne's findings as to the underlying facts. Testing Frame's effectiveness under *Strickland's* constitutional precepts compels the conclusion that Frame's conduct at the resentencing hearing in *Tichnell III* did not so undermine the proper functioning of the adversarial process as to result in a trial which could not be relied upon to produce a just result. *Strickland,* 466 U.S. at 686. With due regard for the distorting effects of hindsight in assessing the effectiveness of an unsuccessful defense, the adversarial testing process was not shown to be unreliable in this case. But in any event, even if Frame was somehow constitutionally deficient under the first prong of *Strick-*

*land,* Tichnell failed to carry his burden of establishing the existence of the second prong of the test—the prejudice component—by showing that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

### IV.

A number of other contentions raised by Tichnell in his post conviction petition were found by Judge Melbourne to be without merit. Before us, Tichnell maintains on his cross-appeal that the post conviction judge was wrong in her disposition of certain substantive issues involved in the guilt-innocence stage of his initial trial in *Tichnell I.* Specifically, he contends: (1) that because of the exclusion of certain jurors with reservations about imposing the death penalty, he was subjected to a "prosecution-prone" jury and thereby denied his right to a fair and impartial jury chosen from a fair cross section of the community; (2) that the introduction of evidence of the victim's good character, and an improper cross-examination about Tichnell's prior arrests, denied him due process of law; and (3) that the State's failure to disclose evidence corroborative of his version of the shooting denied him due process of law.

Tichnell also alleges that Judge Melbourne was wrong in her disposition of other substantive issues which affected sentencing in *Tichnell III.* Specifically, he alleges: (1) that the trial judge improperly instructed the jury with respect to its consideration of mitigating circumstances; (2) that the trial judge failed to instruct the sentencing jury (a) that it had the option to impose a life sentence without regard to the relative weight of the aggravating and mitigating circumstances and (b) that the jury was required to find beyond a reasonable doubt that death was an appropriate sentence under all the circumstances before that sentence could be imposed; (3) that the prosecutor made improper and prejudicial arguments to the jury; (4) that the sentencing jury was collaterally estopped from finding fewer miti-

gating circumstances than those found at the earlier sentencing hearing in *Tichnell II;* and (5) that the trial court erred in admitting into evidence prejudicial and inflamatory autopsy illustrations of the deceased officer.

Associated with these substantive contentions of error in *Tichnell I* and *III* are Tichnell's further claims that Frame rendered ineffective assistance of counsel by failing to make objections at trial or to raise specific issues on appeal. Judge Melbourne found no merit in any of these claims, concluding as to some that Frame was not constitutionally deficient in his representation, and as to others that Frame's performance, while deficient, did not result in prejudice sufficient to warrant post conviction relief. In addition, Judge Melbourne found no merit in Tichnell's further claim that Frame was constitutionally ineffective in his conduct of the voir dire examination in *Tichnell I.*

■■■■ We have reviewed Tichnell's arguments, as set forth in his brief and reply brief. We think that Judge Melbourne was correct in her disposition of all of these issues. Manifestly, there is no merit in Tichnell's "prosecution-prone" jury contention with respect to *Tichnell I. See Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (U.S.1986); *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985); *Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985). Nor did the improper admission of evidence pertaining to Deputy Livengood's good character in *Tichnell I* require reversal of the conviction. As Judge Melbourne said, the erroneous admission of this evidence "was a minor incident in an otherwise honest and impartial trial" and was not so fundamentally unfair as to violate the Fourteenth Amendment. Indeed, the good character evidence consisted merely of a statement during the direct examination of the County Sheriff that Deputy Livengood had never had any complaint filed against him, and that he earned $9,700 a year. Given all the circumstances, we are persuaded beyond a reasonable doubt that the erroneous admission of this evidence did not influence the court's

verdict. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Dorsey v. State*, 276 Md. 638, 648, 350 A.2d 665 (1976). We also agree with Judge Melbourne that the trial judge's error in *Tichnell I* in admitting evidence of Tichnell's mere arrests, over Frame's objection, was cured by the court's later jury instruction not to consider such evidence for any purpose.

As to the claimed denial of due process at *Tichnell I* because of the State's failure to inform Tichnell of allegedly exculpatory information in its possession, Judge Melbourne, after referring to Frame's defense strategy, gave this extensive analysis of the issue:

"In order to prove its theory [of defense] ..., Frame attempted to corroborate each statement made by Tichnell. One of the statements made by Tichnell in describing the incident was that the lights on his car went out while he was circling Davidson's store waiting for Rezek's return. And, although Tichnell had noticed two police cars parked in the front of the building, he got out of his car and attempted to fix the lights by kicking the fender.

"On January 23, 1979, five days after the shooting, Corporal James R. Frey, of the Maryland State Police Department, impounded and inspected Tichnell's 1965 Plymouth. Among his findings were that the headlights did not work due to a loose ground wire.

"This information was not provided to Mr. Frame until *Tichnell III*. Mr. Frame objected vigorously while testifying at the post conviction hearing, as does petitioner presently, that the jury would have reached a different result at the guilt or innocence trial had this evidence been before them. Mr. Frame also stated, at post conviction, that this bit of evidence took on added significance by the State arguing in closing, at *Tichnell II*, that Tichnell's version was not believable 'while [the State] had the test in [its] hip pocket.'

"It should be noted that the loose wiring evidence was considered by the jury in *Tichnell III* before returning a sentence of death.

"Upon considering the totality of the circumstances, this Court is of the opinion that the petitioner was not denied the due process of the law. Mr. Frame made a general request for discovery, and the withholding of the information complained of did not meet the materiality test as described in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 [49 L.Ed.2d 342] (1976).

"The analysis begins with the rule in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196 [10 L.Ed.2d 215] (1963), that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . .' In *United States v. Agurs, supra*, the Supreme Court set forth three situations in which the *Brady* rule usually arises: (1) when the state's case includes perjured testimony and the state knew or should have known the perjury; (2) where there is a request for specific evidence which is withheld or suppressed. *Id.*, 96 S.Ct. at 2397–2398 and (3) where there is a general request or no request for exculpatory materials. *Id.*, 96 S.Ct. at 2399. In the first two situations, conviction must be set aside if the perjured or withheld evidence might have affected the outcome of the trial. *Id.*, 96 S.Ct. at 2398. In the third situation, the conviction must be set aside if the withheld evidence creates a reasonable doubt that did not otherwise exist. *Id.*, 96 S.Ct. at 2402.

"This case does not involve perjured testimony so the first situation in *Agurs* does not apply. In order to determine whether the second or third situation applies, it is necessary to examine Mr. Frame's discovery motion.

"The motion was filed March 22, 1979, and is entitled 'DEFENDANT'S REQUEST FOR DISCOVERY AND MOTION TO PRODUCE DOCUMENTS.' The motion cites Maryland Rule 741, and requests only general information.

There is no reference to any facts of the case nor any mention of witnesses by name.

"Petitioner refers this Court to that section of the motion entitled 'REPORTS OF EXPERTS', and cites paragraph 12:

12. Furnish the substance of any oral report and conclusion made in connection with the defendant's case by each expert consulted by the state, including the results of any physical or mental examination, scientific test, experiment or comparison.

Petitioner claims that the inspection of Tichnell's car by Corporal Frey constitutes a 'scientific test' and that, therefore, Mr. Frame made a specific request for discovery, and, that under the *Agurs* test of materiality, the conviction should be set aside if the withheld evidence might have affected the outcome.

"In *United States v. Agurs, supra,* the Supreme Court referred to *Brady v. Maryland, supra,* as a classic example of a request for specific evidence. In *Brady,* defense counsel requested the extrajudicial statements made by Brady's accomplice, one Boblit. This request is specific because counsel referred to the witness by name (Boblit) and stated the item desired (extrajudicial statements).

"In the present case, Mr. Frame had made a general request for 'any' report, conclusion, examination or test. And, assuming arguendo, the findings of Corporal Frey fall within the category of 'scientific test', the request referred only to expert reports. This would exclude Corporal Frey, whom even petitioner admits, was not an expert. Since Mr. Frame made a general request for discovery, the third situation in *Agurs* applies, and the conviction can only be set aside if the evidence withheld creates a reasonable doubt that did not otherwise exist.

"This is a lesser standard of materiality than the first two situations and one that petitioner has not shown. First of all, the state introduced overwhelming evidence to prove first degree, premeditated murder, independent of the faulty headlight. This evidence includes but is not limited

to, the fact that Tichnell and his co-defendant, Rezek, burglarized Davidson's Army and Navy Discount Store, the fact that Tichnell killed Deputy Livengood by shooting him two times in the front and five times in the back, well beyond the force reasonably necessary for self-defense, the fact that Tichnell killed Deputy Livengood's K–9 with a Samari sword, and, the fact that Tichnell and Rezek stole the Friend's Camaro to attempt an escape before they were arrested by West Virginia authorities.

"Secondly, petitioner's claim that the prosecutor's remarks during closing argument at *Tichnell II* placed added significance on the headlight evidence is unfounded. If anything, the prosecutor's comments might have been material as to sentencing. But, as was discovered in *Tichnell III*, this argument is also without merit. There a jury of twelve considered the faulty headlight evidence and still sentenced the petitioner to death. In any event, any statements made by the prosecutor after Tichnell had been convicted of first degree murder cannot, in any way, be material as to guilt.

"Considering all the evidence presented at trial, and considering all claims presently put forth by petitioner, this Court is of the opinion that the withholding of evidence concerning the faulty headlights in Tichnell's car does not cast a reasonable doubt on the verdict reached by the jury at the guilt or innocence trial. Accordingly, Tichnell was not denied the due process of law."

We find no error in Judge Melbourne's analysis of this issue. Moreover, we note that in *United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court adopted a more flexible standard in determining when a defendant is prejudiced by the prosecution's failure to disclose exculpatory evidence. The Court held that in cases where the defendant requests either "general" or "specific" exculpatory evidence, due process is violated if nondisclosure of the information "undermines confidence" in the trial process. Adopting the prejudice standard set

forth in *Strickland,* the Court held that relief is required if there is a reasonable probability that the outcome of the proceedings would have been different had the evidence been disclosed.

Given the circumstances surrounding this case, confidence in the trial process which resulted in Tichnell's conviction of first degree murder was not prejudicially undermined by the prosecution's failure to disclose the test revealing the loose ground wire. We agree that no reasonable probability exists that the outcome of the case would have been different if the disputed evidence had been before the court in *Tichnell I.*

As to the *Tichnell III* issues, there is no merit in the argument that the sentencing jury in *Tichnell III* was collaterally estopped from finding fewer mitigating circumstances than those previously found by the sentencing authority in *Tichnell II.* In like circumstances, we rejected the identical contention in *Johnson v. State,* 303 Md. 487, 519–22, 495 A.2d 1 (1985). As to the alleged prejudicial and inflamatory autopsy evidence, Judge Melbourne found, and we agree, that the trial judge did not abuse his discretion in admitting this evidence at the sentencing hearing. Judge Melbourne held, as found by the trial judge, that the gruesomeness of the crime was relevant in determining whether a life or death sentence should be imposed. She concluded that the probative value of the autopsy chart, report and photographs outweighed the potential for any prejudicial effect on the jury. Considering Frame's argument that Tichnell's level of culpability did not warrant the death penalty, the fact that Livengood sustained seven wounds was relevant in the process of considering whether a life or death sentence should be imposed. *See Johnson v. State,* 303 Md. 487, 502–04, 495 A.2d 1 (1985); *Bowers v. State,* 298 Md. 115, 468 A.2d 101 (1983).

Tichnell's claim that a resentencing hearing should be granted because of improper and prejudicial closing jury arguments by the prosecution focuses upon the

prosecutor's comment that the Bible was authority for the imposition of the death penalty; that the jury's duty to impose the death penalty was comparable to the victim's duty to enforce the law; that the defendant was a danger to society because he aspired to be a member of a notorious motorcycle gang; that Tichnell should suffer the death penalty because others would thereby be deterred from committing like crimes; that if Tichnell was not executed he would kill again and be a threat to prison guards; and that the jury should think of Deputy Livengood's family when imposing sentence. Judge Melbourne disposed of these contentions on the ground that since no objection was made to the prosecutor's comments in closing argument, and because no special circumstances were shown to excuse the failure to object, the matter could not be considered on post conviction in view of the waiver provisions of Md.Code (1982 Repl.Vol.) Article 27, § 645A(c). While we agree that, in the circumstances, the waiver provisions are applicable, *see Curtis v. State*, 284 Md. 132, 395 A.2d 464 (1978), nevertheless we think that the comments in question did not so undermine the reliability of the sentencing hearing as to deny Tichnell due process of law. In so concluding, we have considered Tichnell's contention that, in light of *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the prosecutor's comments to the jury were inflamatory and irrelevant to any valid penological interest and thus rendered the proceedings fundamentally unfair. *Caldwell* involved a prosecutor's statement to the jury that it need not believe that its decision whether to impose a life or death sentence was final because the defendant had an automatic right of appeal. In vacating the death sentence on the ground that the reliability of the sentencing procedure had been undermined, the Court distinguished these remarks from those in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), where the prosecutor told the jury that he thought defense counsel hoped it would find the defendant guilty of something less than first

degree murder. In *Caldwell,* the Court observed, —— U.S. at ——, 105 S.Ct. at 2645:

"The Donnelly Court emphasized that the prosecutor's comment was 'admittedly an ambiguous one,' *id.,* [416 U.S.] at 645, 40 L.Ed.2d 431, 94 S.Ct. 1868, [at 1872] and declared that the case was not one 'in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.' *Id.,* at 643, 40 L.Ed.2d 431, 94 S.Ct. 1868 [at 1871] (citing *Griffin v. California,* 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229 ... (1965)). Here, in contrast, the prosecutor's remarks were quite focused, unambiguous, and strong. They were pointedly directed at the issue that this Court has described as 'the principal concern' of our jurisprudence regarding the death penalty, the 'procedure by which the State imposes the death sentence.' *California v. Ramos,* 463 U.S., [992] at 999, 77 L.Ed.2d 1171, 103 S.Ct. 3446 [at 3452].... Such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment."

In the present case, as in *Donnelly,* the prosecutor's comments were not pointed directly at the procedure by which the death penalty is imposed as were the prosecutor's comments in *Caldwell;* they did not render the sentencing procedure fundamentally unfair by prejudicially undermining its reliability. *Caldwell,* —— U.S. at ——, 105 S.Ct. at 2645.

■ Tichnell next argues that in *Tichnell III* he was denied due process when the trial judge improperly instructed the sentencing jury (a) that it could not consider, as a mitigating circumstance, any doubt it may entertain about the facts upon which the conviction was based and (b) that there was additional evidence which was probative of Tichnell's guilt that the jury would not hear. Judge Melbourne held that because there was no objection to the instruction, the issue was waived and thus not properly before the post conviction court.

While we agree with the court's disposition of the issue, we note that the trial judge instructed the jury in part, as follows:

"Now, what has transpired in front of you is the part of a trial involving the possibility of the imposition of the Death Penalty, which is called the Sentencing Proceedings. This procedure commences after a defendant has been found guilty at an earlier stage of the trial. This defendant has been found guilty of Murder in the First Degree. You will not speculate as to anything concerning how that came about or whether that is correct or not because that has been completed where this proceeding started. And evidence which may have been admissable or presented in that case may or may not have been presented before you....

&ast; &ast; &ast; &ast; &ast; &ast;

"... Now, a mitigating circumstance I defined for you is anything which would move a person making a judgment between a more severe act and a less severe act to select the less severe as opposed to the more severe. An aggravating circumstance is the opposite of that, something which would move a person making a judgment to make a more severe judgment as opposed to a less severe choice of judgment. To the extent that you find something as a fact in the evidence, all of the evidence presented in this case which you as twelve Ladies and Gentlemen determine to be mitigating circumstances but which is not one of those already listed, you are to write it on these lines...."

We do not think that these instructions precluded the jury from considering, as a mitigating circumstance, any doubt it may have had as to the facts concerning the extent or degree of Tichnell's culpability in the murder. The jury was simply precluded from determining that which had already been adjudicated by an earlier jury, namely, that Tichnell was guilty of premeditated first degree murder of Officer Livengood. Certainly, "anything which would move a person making a judgment" not to select the death

penalty, as instructed by the trial judge, would include anything of a mitigating nature which the jury may believe warranted a sanction less than death. As we said in *Foster v. State, supra,* 304 Md. at 474–75, 499 A.2d 1236:

"A sentencing authority, unconvinced that death is appropriate, may list as a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances."

Nor did the trial judge tell the sentencing jury that there was additional evidence of Tichnell's guilt which it would not be permitted to hear. The court's instruction sought merely to explain the difference to the jury between the guilt and sentencing phases of a capital case, pointing out that all the evidence presented to an earlier jury during the guilt phase of a case may not be introduced during the sentencing phase.

Tichnell also claimed that the trial court erred in failing to instruct the sentencing jury that it had the option of imposing a life sentence without regard to the relative weight of aggravating and mitigating circumstances, and must find beyond a reasonable doubt that a death sentence was appropriate before that sentence could be imposed. No objection having been made to the failure to so instruct, Judge Melbourne properly found that the issue had been waived for post conviction purposes. *See Curtis v. State,* 284 Md. 132, 395 A.2d 464 (1978). We note, however, that the proposed instruction would sanction total disregard for the statutorily mandated weighing process in the sentencing jury's determination whether to impose a life or death sentence. Therefore, the failure to give such an instruction was not error. As the State maintains, if life sentences could be imposed without regard to articulated aggravating

and mitigating factors, there would be no principled or rational way to differentiate the few cases in which the death penalty is justified from the many in which it is not. Nothing in the statute requires that the jury be instructed that it must find beyond a reasonable doubt that death is the appropriate sanction before that sentence may be imposed. *See Foster, Evans and Huffington v. State,* 305 Md. 306, 503 A.2d 1326 (1986); *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985); *Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985).

As to Frame's alleged incompetence in connection with the voir dire examination in *Tichnell I,* Judge Melbourne concluded that the eight questions which he proposed were inadequate but that his "actions at the bench conference, including his *Witherspoon* [*v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)]] objection and the agreement on death penalty qualification, were well within the range of competency." The post conviction judge found that as the questions "finally asked of the jury panel [by the court] adequately protected the defendant's interest, the error did not contribute to the guilty verdict."

██ Tichnell does not appear to take issue with this determination. Rather, he now questions Frame's competency at the voir dire examination of the sentencing jury in *Tichnell III,* a point not decided by Judge Melbourne. We have nevertheless reviewed the voir dire in *Tichnell III* in light of Tichnell's contention that Frame was ineffective for (1) failure to prepare voir dire questions prior to the date of the sentencing hearing, as requested by the trial judge, and (2) because his proposed questions, drafted on the morning of the hearing, fell below reasonable professional standards. The record discloses that on the morning of the sentencing hearing Frame indicated that he had not prepared any voir dire questions for the court to propound to the jury because he wanted personally to conduct the voir dire examination in order "to make a meaningful, searchful inquiry as to the attitudes, knowledge, eccentricities ... of

the members that make up this jury panel." The trial judge refused to permit such a voir dire examination and indicated that it would propound all questions to the jury panel. Thereafter, the court solicited proposed questions from Frame and from the prosecutor, a number of which the court asked. We think that Tichnell's rights were adequately protected during the voir dire and that no reasonable probability exists that further voir dire would have changed the outcome of the sentencing hearing.

Finally, we consider Tichnell's contention that Frame was constitutionally ineffective (1) for failure to make appropriate objections at trial to improper questions, evidence, comments and jury instructions and (2) for failing to raise issues on appeal where there existed an arguable chance of success. Tichnell summarily identifies these issues in his brief as the introduction of improper character evidence about the decedent, improper remarks by the prosecutor in closing argument, the introduction of inflamatory pictures, and improper instructions at sentencing. Without supporting argument, he claims that taken individually each issue provides a basis for relief and that collectively Frame's errors at trial and on appeal undermined confidence in the outcome of the capital sentencing hearing.

Judge Melbourne's opinion fully addressed these issues, and we agree with her that none merit post conviction relief. She found either that the disputed evidence was properly admissible, that the instructions were not improper, or that Frame's errors did not contribute to Tichnell's conviction or to the imposition of the death sentence.

We thus conclude that Tichnell's counsel in *Tichnell I* and *III* was not constitutionally ineffective and that none of the other errors asserted in the post conviction petition warrant relief.

ORDER OF THE CIRCUIT COURT FOR CALVERT COUNTY GRANTING A NEW CAPITAL SENTENCING PROCEEDING REVERSED; IN ALL OTHER RESPECTS, THE ORDER OF THAT COURT IS AFFIRMED; CASE

**470**

REMANDED TO THE CIRCUIT COURT FOR CALVERT COUNTY FOR THE PURPOSE OF ENTERING AN ORDER DENYING ALL POST CONVICTION RELIEF TO RICHARD DANNY TICHNELL.