599 A.2d 1171

**STATE of Maryland**

v.

**Donald THOMAS.**

No. 146, Sept. Term, 1990.

Court of Appeals of Maryland.

Jan. 9, 1992.

162

164

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellant, cross appellee.

H. Mark Stichel (Edward K. Dunn, III, A. Bradley Parham, Piper & Marbury, Baltimore, William Kanwisher, Asst. Public Defender of Glen Burnie, on brief), for appellee, cross appellant.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

On November 18, 1982, a jury in the Circuit Court for Baltimore County convicted Donald Thomas of the first degree murders of Donald Spurling and his wife, Sarah. At the same trial, Thomas was also found guilty of the first degree rape of Noel Wilkins, of committing two first degree sexual offenses upon Ms. Wilkins, and of robbing her at knife point. Having been previously given the required statutory notice that the death penalty would be sought for the first degree murders, Thomas elected to have the trial judge decide whether he should be executed for those crimes.

On December 13, 1982, Thomas was sentenced to life imprisonment for the murder of Donald Spurling, death for the murder of Sarah Spurling, concurrent terms of life imprisonment for the first degree rape and first degree sexual offenses, and a twenty-year consecutive sentence for the armed robbery. This Court affirmed the judgments of the circuit court as to both the convictions and the sentences, including imposition of the death sentence. *Thomas v. State*, 301 Md. 294, 483 A.2d 6 (1984). The Supreme Court of the United States denied Thomas's petition for writ of certiorari. 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985).

Thomas then filed a petition for post conviction relief. Thomas sought a new trial, or in the alternative, a new sentencing hearing. After conducting an evidentiary hearing on the petition, the court found no merit in the claims that Thomas had been improperly convicted but vacated his

death sentence and ordered a new sentencing hearing. This relief was granted because the court concluded that trial counsel had failed to render Thomas effective assistance when he permitted Thomas to be re-examined by Dr. Michael Spodak following his convictions in preparation for Dr. Spodak's testimony at the sentencing hearing.

The State applied for leave to appeal the court's granting of a new sentencing hearing to Thomas. Thomas filed a cross-application to appeal the court's denial of a new trial on the charges of which he had been convicted. We granted both applications on January 23, 1991.

## I.

In an indictment filed on November 9, 1981, Thomas was charged with the crimes of which he now stands convicted. He entered pleas of not guilty by reason of insanity and incompetency to stand trial. Pursuant to Maryland Code (1957, 1979 Repl.Vol.), Art. 59, §§ 23–28, the court ordered that he be transferred to the Clifton T. Perkins Hospital Center for a mental examination and evaluation.

Dr. Spodak, a member of the staff at Clifton Perkins, after conducting a psychiatric examination of Thomas, prepared a "psychiatric case work up report." Reports were also prepared by one of the hospital's social workers who had interviewed Thomas and by a clinical psychologist who related his findings upon his testing of Thomas. On February 4, 1982, Thomas appeared at a conference at Clifton Perkins attended by Dr. Spodak, the social worker who had interviewed him, the clinical psychologist who had tested him, and three other staff psychiatrists. Thomas was further interviewed at this conference. It was the unanimous opinion of the psychiatrists present at that conference that

"At the present time Mr. Thomas is able to understand the nature and object of the proceedings against him and to assist in his own defense."

"At the time of the alleged offenses, Mr. Thomas was not suffering from a mental disorder which caused him to

lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

Those conclusions were reported to the court, and Thomas was returned to the Baltimore County Jail.

In light of the Clifton Perkins evaluation, R. Clark Kinsley, Esq., the public defender assigned as Thomas's trial counsel, arranged to have him examined by a psychiatrist of his choice, Dr. B.F. Beran. That examination produced no evidence with which to contest the evaluation of the Clifton Perkins staff, and Mr. Kinsley so advised the court at the outset of the trial on October 18, 1982. The court concluded that Thomas was competent to stand trial. Thomas was then re-arraigned and entered a plea of not guilty to all of the charges pending against him.

After the jury returned its verdicts, the State petitioned the court for permission to conduct a pre-sentence psychiatric evaluation of Thomas. It represented in that petition:

"1. That the Defendant was evaluated at the Clifton T. Perkins Hospital Center following his entry of a plea of not guilty by reason of insanity;

"2. That the findings of the Hospital Center are contained in a report to the Court dated February 4, 1982;

"3. That it is desirable to supplement the original insanity evaluation with further interview(s) of the Defendant to develop material for presentation at sentencing;

"4. That Dr. Michael Spodak, who participated in the insanity evaluation, can conduct such further interview with the Defendant at the Baltimore County Detention Center and can do so within a few days of a court order authorizing such evaluation;

"5. That counsel for the Defendant has no objection to such an evaluation."

The court granted that petition, and Dr. Spodak interviewed Thomas on November 27, 1982. Before the interview began, Dr. Spodak advised Thomas that he had been "retained by the State's Attorney's office ... to evaluate him on

certain issues concerning the death penalty and that depending on what he said and depending on my findings, I might very well be called as a witness to testify at the sentencing phase." Dr. Spodak also testified that Thomas indicated that he understood that explanation and was willing to be interviewed at that time.

Dr. Spodak wrote to the office of the State's Attorney on November 30, 1982. He stated that based upon his several interviews with Thomas as a member of the staff of Clifton Perkins, the interview he conducted on November 27, and the review of records associated with the case he was of the opinion to a reasonable medical certainty that the murders of Donald and Sarah Spurling were not committed while the capacity of Thomas to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance or intoxication. He further opined that it is not unlikely that Thomas would engage in further criminal activities that would constitute a continuing threat to society. These opinions negated two possible circumstances which might mitigate against the death penalty pursuant to Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 413(g)(4) and (7).

At the sentencing hearing, the State called Dr. Spodak as a witness. Mr. Kinsley, who had been provided a copy of Dr. Spodak's report to the State's Attorney's office on November 30, 1982, objected to any opinions being expressed by Dr. Spodak. He argued that he was under the impression that Dr. Spodak would interview Thomas as a neutral expert from the Clifton T. Perkins Hospital Center when he consented to the interview of Thomas following the jury's verdicts. He stressed that, had he been aware that Dr. Spodak had been employed by the State's Attorney's office to conduct that evaluation, he would not have consented to the evaluation. The court overruled the objection and admitted Dr. Spodak's testimony and his November 30, 1982 report.

On direct appeal to this Court Thomas contended that the trial judge had erred in admitting this evidence since its admission violated his Fifth, Sixth, and Fourteenth Amendment rights, citing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Distinguishing the instant case from *Estelle*, we held that the court properly admitted Dr. Spodak's testimony and report and that the admission of this evidence did not violate Thomas's Fifth, Sixth and Fourteenth Amendment rights. *Thomas v. State*, 301 Md. at 324–29, 483 A.2d at 22–24.

In his petition for post conviction relief, Thomas asserted that Kinsley, in allowing him to be interviewed without counsel by Dr. Spodak post-verdict and pre-sentence, had rendered him ineffective assistance of counsel, prejudicing him at sentencing in violation of his right to counsel under the Sixth Amendment. At the post conviction hearing, Thomas called Kinsley as his witness and questioned him extensively on his rationale for allowing Thomas to be re-examined by Spodak. Kinsley explained that he believed that Spodak's role in re-examining Thomas was that of a neutral expert from the Clifton T. Perkins Hospital Center, and that Spodak would therefore be impartial. He further testified that he instructed Thomas to cooperate fully with Spodak in the hope that something beneficial to Thomas might come from the examination. During cross-examination, the State attempted to elicit testimony from Kinsley regarding the results which he had received of Dr. Beran's pretrial psychiatric examination of Thomas. The court sustained Thomas's objection to that line of questioning. Following the conclusion of the hearing on August 15, 1990, the hearing judge considered memoranda submitted by the parties and on November 21, 1990, re-convened the hearing and rendered an oral opinion granting Thomas a new sentencing hearing but denying him any post conviction relief from his convictions.

## II.

On appeal the State argues that Kinsley's decision to permit Thomas to be interviewed by Dr. Spodak without

counsel present was a tactical decision which does not constitute the basis for post conviction relief. Alternatively, the State contends that the hearing judge erred in excluding testimony from Kinsley as to what he had learned from Dr. Beran's psychiatric examination of Thomas, which knowledge was relevant to the reasonableness of his strategy in permitting the post-verdict, pre-sentence interview of Thomas by Dr. Spodak.

The standards by which we measure whether Thomas received assistance of counsel commensurate with the Sixth Amendment guarantee were promulgated by the Supreme Court of the United States in *Strickland v. Washington* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court has since applied those standards in *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); and *Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). The *Strickland* court stated at 466 U.S. 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

The Court also emphasized that the critical basis of inquiry is not whether counsel committed a professional error but whether the defendant received a fundamentally fair trial:

"The Court has not elaborated on the meaning of the constitutional requirement of effective assistance in the latter class of cases—that is, those presenting claims of 'actual ineffectiveness.' In giving meaning to the requirement, however, we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.... Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial."

*Id.* at 686–689, 104 S.Ct. at 2064–2065, 80 L.Ed.2d at 692–694.

The Court also observed:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

172

See *Michel v. Louisiana, supra*, 350 U.S. [91], at 101, 76 S.Ct. [158], at 164 [100 L.Ed. 83 (1955)]."

*Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–695. The Court commented upon the important policy considerations which mandate such a deferential review:

"The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

*Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

This court first applied the *Strickland* tests in *Harris v. State*, 303 Md. 685, 496 A.2d 1074 (1985). We revisited its teachings in *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), *rehearing denied*, 479 U.S. 1060, 107 S.Ct. 942, 93 L.Ed.2d 992 (1987); *State v. Colvin*, 314 Md. 1, 548 A.2d 506 (1988); and *Bowers v. State*, 320 Md. 416, 578 A.2d 734 (1990).

In the instant case, the State contends that the post conviction court mis-applied the *Strickland* tests in evaluating Kinsley's decision to permit Thomas, without counsel, to be interviewed by Dr. Spodak for the purpose of preparing Dr. Spodak to testify at the sentencing hearing. It argues that this decision was a reasonable tactical determination undertaken in the hope that some favorable psy-

chiatric evidence might be obtained for use at the sentencing hearing. Alternatively, the State asserts that the post conviction court committed reversible error when it sustained Thomas's objection to the State's attempt to elicit from Kinsley his understanding of the results of Dr. Beran's psychiatric evaluation. This information, the State posits, was necessary to any fair evaluation of Kinsley's strategy. Because we agree with the State's alternative contention, we shall vacate the judgment granting partial post conviction relief and remand the case for admission of that excluded testimony and further consideration, in light of that evidence, of the reasonableness of Kinsley's decision to permit Dr. Spodak's post-verdict, pre-sentence interview.

The Supreme Court stressed in *Strickland* that "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, *viewed as of the time of counsel's conduct.*" *Strickland, supra* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695 (emphasis added). Applying this standard in the instant case, it is clear that without Kinsley's testimony concerning his understanding of the results of Dr. Beran's examination of Thomas prior to trial, the post conviction court could not fairly or accurately determine whether Kinsley's decisions in connection with the Spodak interview were deficient under the first prong of the *Strickland* test. For example, if Kinsley had been told by Dr. Beran that Thomas suffered from no mental impairments and exhibited the likelihood of future danger to society, then Kinsley's decision to allow further examination in the hope of obtaining a favorable diagnosis may well have been reasonable. Accordingly, we hold that the post conviction court erred in preventing Kinsley from testifying as to what he had already learned from Dr. Beran about Thomas's mental state at the time he gave permission for Thomas to be interviewed by Spodak.

 In reaching this conclusion, we reject the notion advanced by Thomas that any conclusions reached by Dr. Beran were protected from disclosure by Kinsley because of

the attorney-client privilege since they necessarily were based on his interviews with Thomas. Md.Code (1974, 1989 Repl.Vol.), § 9–108 of the Courts and Judicial Proceedings Article provides: "A person may not be compelled to testify in violation of the attorney-client privilege." This statute is declarative of the well-settled common law rule which had been recognized in this State prior to its enactment by Chapter 2, § 1 of the Acts of 1973, 1st Spec.Sess. *Harrison v. State*, 276 Md. 122, 135, 345 A.2d 830, 838 (1975). The communications between Thomas and Dr. Beran, were within the attorney-client privilege since Dr. Beran was then acting as an agent for Mr. Kinsley, who required the psychiatrist's services in order to prepare his client's defense. *State v. Pratt*, 284 Md. 516, 520, 398 A.2d 421, 423 (1979). Notwithstanding the privileged nature of these communications and the opinions reached by the psychiatrist based upon them, we adopt the universally accepted rule that the privilege is waived by the client in any proceeding where he or she asserts a claim against counsel of ineffective assistance and those communications, and the opinions based upon them are relevant to the determination of the quality of counsel's performance. *U.S. v. Ballard*, 779 F.2d 287, 292 (5th Cir.1986), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *Tasby v. U.S.*, 504 F.2d 332, 336 (8th Cir.1974); *State v. Taylor*, 327 N.C. 147, 393 S.E.2d 801, 805 (1990); *Petition of Gillham*, 216 Mont. 279, 704 P.2d 1019, 1020 (1985); *Gall v. Com.*, 702 S.W.2d 37, 44–45 (Ky.1985); *State v. Moreno*, 128 Ariz. 257, 625 P.2d 320, 323 (1981); *Logston v. State*, 266 Ind. 395, 363 N.E.2d 975, 977 (1977); *Peppers v. Balkcom*, 218 Ga. 749, 130 S.E.2d 709, 711 (1963); *Waitkus v. Mauet*, 157 Ariz. 339, 757 P.2d 615, 616 (App.1988); *In re Gray*, 123 Cal. App.3d 614, 617, 176 Cal.Rptr. 721, 723 (1981); Edward W. Cleary, *McCormick on Evidence* § 91, at 220–21 (3d ed. 1984); Charles E. Torcia, *Wharton's Criminal Evidence* § 517, at 129 (14th ed. 1987); 8 John H. Wigmore, *Evidence* § 2327(6), at 638 (McNaughton ed. 1961); Lynn McLain, *Maryland Evidence* § 503.12, at 494–95 (1987). As we

explained earlier, what Dr. Beran related to Mr. Kinsley with regard to his psychiatric evaluation of Thomas was highly relevant to the reasonableness of the strategy employed by Kinsley in agreeing to permit Dr. Spodak to interview Thomas. Consequently, we hold that the attorney-client privilege did not prevent Kinsley's disclosure of Dr. Beran's psychiatric evaluation of Thomas.

### III.

■ The post conviction court granted Thomas a new sentencing hearing on the sole ground that his trial counsel had rendered him ineffective assistance when he allowed Thomas to be interviewed alone by Dr. Spodak. At the post conviction hearings, Thomas had presented evidence and argument in support of several alternative grounds upon which he was entitled to a new sentencing hearing. These grounds were rejected by the hearing judge. Before us, Thomas again urges that any of these grounds support the court's order that he be provided a new sentencing hearing.

Preliminarily, the State argues that these issues were not presented in either the application of the State or the cross application of Thomas for leave to appeal from the order of the post conviction court and, therefore, that they are not properly before us. We disagree.

Each of the issues were discussed in the response which Thomas filed to the State's application for leave to appeal the partial grant of post conviction relief. Maryland Rule 8–306(e), which governs review by this Court in capital cases states that Md.Rule 8–204, which regulates applications for leave to appeal to the Court of Special Appeals, shall govern appeals of post conviction proceedings in capital cases except that the application shall be filed in this Court. When we granted the State's application for leave to appeal from the order granting a new sentencing hearing, we did not limit the issues on appeal in any way.

Md.Rule 8–204(g) provides that if an application for leave to appeal is granted, further proceedings "shall be conduct-

ed pursuant to this Title and as if the order granting leave to appeal were a notice of appeal filed pursuant to Rule 8–202." Thus, if this case were before the Court of Special Appeals pursuant to a notice of appeal, that court could affirm the post conviction court's order "on any ground adequately shown by the record (and even though the ground was not relied on by the [post conviction judge] )." *J.I. Case Credit Corp. v. Insley,* 293 Md. 483, 487, 445 A.2d 689, 691 (1982). Consequently, we hold that Thomas is entitled to seek affirmance of the grant of partial post conviction relief on any alternative grounds not relied upon by the hearing judge.

## A.

Thomas contends that his election to be sentenced by the court rather than by the jury which had convicted him of the first degree murders of Donald and Sarah Spurling was not a knowing and intelligent one. He bases this contention on the fact that the verdict sheet which would have been employed by the jury in any sentencing proceeding would have been identical to the one which was in issue in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In *Mills* the Supreme Court vacated a death sentence because it concluded that under the verdict sheet *and the instructions of the trial court as to how it was to be completed* there was a substantial risk that the jurors might have been misled into believing that they could only consider a circumstance mitigating against the imposition of death if they unanimously agreed that such circumstance had been established by the evidence. *Id.* 486 U.S. at 384, 108 S.Ct. at 1870, 100 L.Ed.2d at 400. Consequently, Thomas asserts that his only option was to be sentenced by the court or under an unconstitutional procedure before a jury.

We, like the hearing judge, are unpersuaded. Thomas's argument presumes that the jury which would have sentenced him would have been incorrectly instructed on the employment of the verdict sheet as was the jury in *Mills.*

See *Mills v. State*, 310 Md. 33, 54, 527 A.2d 3, 13 (1987) cert. granted, 484 U.S. 975, 108 S.Ct. 484, 98 L.Ed.2d 483 (1987), and vacated, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). That sheer speculation does not entitle Thomas to relief from the court imposed death sentence.

### B.

Thomas next contends that the State misled Mr. Kinsley into consenting to his post-verdict, pre-sentence interview with Dr. Spodak by not advising Kinsley that Spodak would be paid for his services by the office of the State's Attorney rather than as a member of the staff of Clifton Perkins. The hearing judge after weighing disputed testimony as to who said what to Mr. Kinsley, expressly found that there was no deception by the State in connection with procuring Kinsley's consent. That conclusion was not clearly erroneous. Md.Rule 8–131(c).

### C.

■ Thomas also submits that the post conviction relief granted him was proper because of an inappropriate relationship existing between the State and Dr. Spodak at the time of Thomas's sentencing. Specifically, Thomas argues that evidence introduced at the post conviction hearing demonstrated that Spodak was an "agent" of the State. Thomas asserts that in light of this special relationship, Spodak should not have been permitted to testify at the post conviction hearing, and that his participation in the pretrial evaluation of Thomas was improper.

The short answer to Thomas's contention is that this issue has been finally litigated. Md.Code (1957, 1987 Repl. Vol.), Art. 27, § 645A(b). On direct appeal, this Court considered the question of whether there was an inappropriate relationship between Spodak and the State such that Spodak's testimony was biased and therefore inadmissible. We held that "[Thomas's] objection was one going to the weight, rather than the admissibility.... [A]ccordingly we

[found] no error in the admission of this evidence." *Thomas, supra,* 301 Md. at 328, 483 A.2d at 23. As to whether there was an inappropriate relationship between the State and Dr. Spodak at the time of Thomas's pretrial evaluation which allegedly tainted his testimony at the sentencing hearing, Thomas presented no evidence at the post conviction hearing which even remotely indicates such an improper relationship.

### D.

Thomas next asserts that Mr. Kinsley rendered ineffective assistance at his sentencing because he: 1) failed to comprehend fully the relevancy of evidence concerning mental impairment of the defendant in a death sentence proceeding; and 2) neglected to consult with a psychiatrist or psychologist prior to the sentencing hearing because he felt that Dr. Spodak "was in effect [his] psychiatrist."

With regard to Thomas's contention that Kinsley failed to understand the relevancy of evidence dealing with mental impairment of the defendant, this Court's review on Thomas's direct appeal of the evidence presented in mitigation refutes this argument:

"In the instant case, appellant introduced evidence that he had a below normal IQ and had suffered a serious head injury during his early teens; that he was the product of a broken home and had been a victim of child abuse; that his mother was a chronic alcoholic who died when appellant was a teenager; and that his father deserted the family early on. It was also shown that appellant fathered two children and has a history of drug and alcohol abuse. Prior to the murders, appellant had been convicted in 1976 for robbery.

"In passing sentence upon appellant, the court considered all of these factors. It found that his family background was a mitigating circumstance under § 413(g)(8). The court also accepted appellant's claim, made during closing argument, that he had a 'mental age' of 14 or 15, though no such evidence was presented."

*Thomas, supra* at 332, 483 A.2d at 26 (footnote omitted). Thus, under these circumstances, we hold that Kinsley's conduct was that of a reasonably competent attorney, and that Thomas has failed to demonstrate under the *Strickland* test that Kinsley's actions were deficient.

On the issue of whether Kinsley rendered ineffective assistance when he failed to consult with another psychiatrist or psychologist prior to Thomas's sentencing, we hold in accordance with Part II of this opinion that without the admission of evidence revealing what Kinsley knew from Dr. Beran's pre-trial psychiatric evaluation of Thomas, a court cannot fully evaluate Kinsley's effectiveness in this regard.

### E.

█ Thomas next maintains that imposing the death penalty constitutes cruel and unusual punishment in violation of Article 16 of the Maryland Declaration of Rights [1] since he has an I.Q. of 73 and organic brain damage. Thomas argues that even though the Supreme Court of the United States has held it is not necessarily a violation of the Eighth Amendment to the United States Constitution [2] to execute a mentally retarded person,[3] the Maryland Declaration of Rights *may include* protections not found in corresponding provisions of the United States Constitution. In support of this argument Thomas points out that in 1989, the General Assembly amended the prescribed punishments for murder

---

**1.** Article 16 of the Maryland Declaration of Rights provides: "That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."

**2.** U.S. Const. amend. VIII. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

**3.** *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that as long as the sentencing body can consider and give full effect to mitigating evidence of mental retardation, imposition of death sentence is not barred by Eighth Amendment).

to prohibit the imposition of a death sentence upon a person who was mentally retarded at the time of the crime.[4] Accordingly, Thomas urges this Court to interpret Article 16 of the Maryland Declaration of Rights as prohibiting imposition of the death penalty upon those who are mentally retarded.

Initially, we note that Thomas may have waived this issue by failing to raise it on his direct appeal of his conviction to this Court. Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 645A(c); *Curtis v. State*, 284 Md. 132, 150–51, 395 A.2d 464, 474–75 (1978).

Nonetheless, assuming the issue is properly before us, we observe that Thomas does not fall within the statutory definition of a mental retardate. Pursuant to Md.Code (1957 Repl.Vol., 1990 Cum.Supp.), Art. 27, § 412(e)(3), a person is deemed to be mentally retarded if

"the individual has significantly subaverage intellectual functioning *as evidenced by an intelligence quotient of 70 or below* on an individually administered intelligence quotient test and impairment in adaptive behavior, and the mental retardation is manifested before the individual attains the age of 22." (emphasis added).

Thomas's I.Q. is 73.

### F.

■■■ Finally, Thomas claims that even if the State's failure to disclose police records on Donald Spurling did not entitle him to a new trial (see Part IV, B. *infra*), the withholding of the information entitled him to a new sentencing hearing. In order for Thomas to prove such a claim, he must demonstrate that there is a *substantial possibility* that had the evidence been disclosed to the defense his sentence would have been different. *Bowers v. State*, 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990). Based

---

**4.** *See* Chapter 677 of the Acts of 1989 (codified as Md.Code (1957 Repl.Vol.1991 Cum.Supp.) Art. 27, § 412(f)).

on our review of the record in this case, we hold that Thomas has failed to make such a showing.

In Thomas's prosecution, the State sought two sentences of death for the murders of Donald and Sarah Spurling. While a sentence of death was imposed for Sarah Spurling's murder, a life sentence was imposed for the murder of Donald Spurling. In pronouncing sentence for the murder of Donald Spurling, it is clear that the trial judge fully considered the mitigating circumstances connected with Donald Spurling's aggressive traits. In his discussion of mitigating factors guiding his decision, the trial judge indicated that he recalled that Spurling used violence in collecting a $15.00 or $20.00 debt owed to him by Sam Houseman, who testified at trial. Moreover, in describing his understanding of what took place at Spurling's house at the time of the murder the trial judge stated:

"Something happened which still, honestly, has me perplexed. The defendant says Mr. Spurling stabbed him in the leg for no apparent reason, as he puts it, as I recall. Be that as it may, the retaliation by the defendant far exceeded that which was necessary from the multiple stab wounds, it is quite apparent, if that occurred. I don't know what occurred. It is the stated theory that there was some discussion about doing a job or something like that, but, whatever triggered this, I don't know, and I don't want to speculate when this man's life is in jeopardy."

As to Sarah Spurling's murder, we find nothing in the police reports concerning Donald Spurling's aggressive behavior that is relevant to the sentence of death imposed. Whatever conduct by Donald Spurling which might have provoked Thomas to kill him certainly did not mitigate Thomas's murder of Sarah.

## IV.

In his cross-appeal Thomas contends that the post conviction court erred in refusing to grant him a new trial on his

guilt or innocence of the crimes of which he was convicted. His cross appeal is based on two grounds.

## A.

Thomas claims that he was denied his right to effective assistance of counsel because his trial counsel failed to preserve for appellate review the trial court's refusal to strike certain prospective jurors for cause. Only two of the veniremen who were challenged, Frederick Schwenker and Robert Siperek, actually served on the jury that convicted Thomas. On his direct appeal, we refused to review Thomas's unsuccessful challenges for cause because he used only 16 of the 20 peremptory challenges to which he was entitled, and at the conclusion of the jury selection process, he stated that the jury as impanelled was acceptable to him. *Thomas v. State,* 301 Md. at 310, 483 A.2d at 14–15.

Assuming that Mr. Kinsley's failure to preserve Thomas's challenges of jurors for cause constituted deficient performance sufficient to satisfy the first prong of the *Strickland* test, we hold that Thomas has failed to satisfy his burden under the second prong of that test to demonstrate that his trial counsel's errors prejudiced his defense.[5]

Thomas alleges that had this Court reached the jury selection issues raised on Thomas's direct appeal, there is a reasonable probability that we would have reversed his convictions. Thomas bases this assertion on the premise that the trial court erred in refusing to strike a number of prospective jurors for cause. Specifically, he claims that the trial judge erred in failing to strike 14 veniremen due to

---

5. The Supreme Court noted in *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 (1984):

"The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

their views on interracial sex,[6] and because some were prepared to give greater credence to the testimony of a police officer than to that of a civilian witness.

■ Initially, we note that the prejudice component of *Strickland* "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*" *State v. Tichnell,* 306 Md. 428, 441, 509 A.2d 1179, 1185–86 (1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), *rehearing denied,* 479 U.S. 1060, 107 S.Ct. 942, 93 L.Ed.2d 992 (1987) *citing Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (emphasis added). *Strickland* makes clear that a mere possibility that an error had some conceivably adverse effect on the defense is not enough:

"Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."

466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697 (citation omitted). What is required is that the defendant must show that there is a *substantial possibility* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Bowers v. State,* 320 Md. at 426–27, 578 A.2d at 739.

■ Thus, in a case such as this one, where a claimant asserts ineffective assistance of counsel based on counsel's failure to preserve issues concerning jury selection, claimant must show that there is a substantial possibility that the

---

6. Thomas is black. The victim of the rape and first degree sexual offenses for which he was being tried is white. His defense to those charges was her alleged consent to sexual activity with him.

specified prejudice influenced the jury impanelled. Merely speculating as to how jurors who did not serve would rule, or hypothesizing about alternative use of peremptory challenges on jurors who did not serve is insufficient. The focus of the reviewing court in examining the prejudice component of *Strickland* in such cases must rest solely on those jurors who actually served. *Cf. Rosales–Lopez v. United States*, 451 U.S. 182, 191, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22, 30 (1981) (refusal of particular *voir dire* inquiry necessitates reversal only where these is a reasonable possibility that the refusal may have influenced jury); *Hunt v. State*, 321 Md. 387, 420, 583 A.2d 218, 234 (1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991) (striking of prospective juror for insufficient cause not reversible error where unobjectionable jury obtained).

■■■ In the instant case, Thomas alleges erroneous rulings by the trial judge on his challenges for cause with respect to only two people who actually served on the jury. He contends that Mr. Schwenker and Mr. Siperek should have been excused for cause based on their comments on interracial sex. Specifically, Thomas states that Schwenker said that he would object to his daughter marrying a black man, and Siperek admitted that he disapproves of sex between a black man and a white woman because he "was brought up that way." Thomas also asserts that Siperek should have been excused because he was prepared to accord special deference to the testimony of police officers. A review of the actual responses from these two jurors, however, reveals that Thomas's characterizations of their answers is taken out of the context in which they were elicited, and that the trial judge did not abuse his discretion in denying Thomas's challenge of them for cause.

The following colloquy between Schwenker and Kinsley is illustrative:

"MR. KINSLEY: I have a few more questions. How do you feel about sex between a black man and a white woman? Do you approve it or disapprove it?

MR. SCHWENKER: It is their affair.

MR. KINSLEY: That is not the answer to the question though. How do you feel about it?

MR. SCHWENKER: I think I have indicated to you that is their affair, and it is fine by me. It is not my business.

MR. KINSLEY: Do you approve it or disapprove it?

MR. SCHWENKER: I don't have an answer for you and you can wait all afternoon, but I think we are at an impasse on that. I have told you it is not my concern what people do in the privacy of their bedroom, as I would believe it is not the concern of someone else what I do in the privacy of my bedroom....

MR. KINSLEY: Do you have any black friends?

MR. SCHWENKER: Yes, I do.

MR. KINSLEY: Do you have them in your home socially?

MR. SCHWENKER: Occasionally.

MR. KINSLEY: Ever go to their homes?

MR. SCHWENKER: Occasionally.

MR. KINSLEY: How often is occasionally?

MR. SCHWENKER: How often?

MR. KINSLEY: Yes.

MR. SCHWENKER: On the order of two, possibly three, times a year.

MR. KINSLEY: Would you have any objection to your 18-year old daughter going out with a black man?

MR. SCHWENKER: No.

MR. KINSLEY: Would you have any objection to her marrying a black man?

MR. SCHWENKER: It is her choice.

MR. KINSLEY: It is a good question.

MR. SCHWENKER: It is her choice.

MR. KINSLEY: Oh, her choice. Well, that isn't the answer. Would you have any objection to her marrying a black man?

MR. SCHWENKER: Yes.

MR. KINSLEY: Why?

MR. SCHWENKER: It might make it rough on her for the rest of her life.

MR. KINSLEY: Why?

MR. SCHWENKER: If she understands all the problems, I would be willing to concede.

MR. KINSLEY: What problems?

MR. SCHWENKER: Getting along with the rest of society.

MR. KINSLEY: In what way?

MR. SCHWENKER: Acceptance.

MR. KINSLEY: Why acceptance?

MR. SCHWENKER: I think everybody understands.

MR. KINSLEY: No, we don't. You tell us.

MR. SCHWENKER: I think it is commonly known.

MR. KINSLEY: Tell us what you know.

MR. SCHWENKER: There are difficulties in today's society in the United States with acceptance in mixed marriage.

MR. KINSLEY: You would disapprove for that reason?

MR. SCHWENKER: Unless I was convinced otherwise they could make it.

MR. KINSLEY: But you have a personal bias of your own, don't you?

MR. SCHWENKER: No.

MR. KINSLEY: You personally would accept him; is that right?

MR. SCHWENKER: Yes."

Similarly, there is no basis upon which to hold that juror Siperek should have been excluded for his remarks on interracial sex. When first asked about his feelings concerning "sex between a black man and a white woman," Siperek responded that "it doesn't matter to me, really it doesn't." Later, when pressed to chose between approving and disapproving, Siperek said that he disapproved because he "was brought up that way." He emphatically denied,

however, that he was "brought up to have prejudice against black people." Instead, Siperek explained that his disapproval of interracial sex was based on his concern that "any kid; would come out of it, they would have a hard time the rest of their lives, I think." Moreover, regardless of his disapproval, Mr. Siperek stated that he could accept the testimony of a defendant who claimed that a white woman liked sex with black men.

Thomas also asserts that Siperek should have been dismissed for cause based upon his answers to questions regarding the superior credibility of police officers. Again, a review of the colloquy between Kinsley and Siperek belies that assertion:

"Mr. Kinsley: If it came to pass that you were called upon to consider who was lying, a police officer or the Defendant with a criminal record, setting aside all other considerations you may have heard in the case, would you believe the police officer over the Defendant with a criminal record simply because he is a police officer?

Mr. Siperek: That is a hard one to answer.

Mr. Kinsley: I am only asking hard ones. This is hard ball.

Mr. Siperek: To tell you the truth, I would probably lean toward the officer. . . .

Mr. Kinsley: Do you think a cop, a police officer, would take the stand and lie? Could you accept that as a possibility?

Mr. Siperek: I guess. Everyone I guess could.

Mr. Kinsley: Could you accept the possibility of evidence directed to the fact that the police would actually stage a crime, in other words, make a situation look like a crime is committed when it wasn't?

Mr. Siperek: Yes.

Mr. Kinsley: Do you think they could do that?

Mr. Siperek: Sure.

Mr. Kinsley: Have you ever known of a police officer to lie on the stand?

Mr. Siperek: Not personally.

Mr. Kinsley: How about from others? You have read about it?

Mr. Siperek: I have read about it in the papers.

Mr. Kinsley: Very good. I have no further questions."

Following this line of inquiry, the State inquired of the juror:

"Mr. Brennan: ... Mr. Siperek, if you were chosen as a member of the jury could you consider all of the evidence of all of the witnesses and all of the exhibits that may be put into evidence, consider those factors and apply the law as instructed by the Court in rendering your decision in this case?

Mr. Siperek: Yes."

In sum, a review of Thomas's complaints levied against the two jurors who served reflects no showing of an abuse of discretion by the trial judge that would have resulted in a reversal of his convictions on direct appeal.

### B.

▮ The second contention made by Thomas in his cross-appeal is that the State failed to disclose evidence in its possession which was material to his defense, thereby denying him due process of law under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In preparing for Thomas's jury trial, Kinsley sought to obtain evidence that Donald Spurling was a violent person or that Spurling had a criminal record. Such evidence was relevant to Thomas's claim that he killed Spurling in self-defense after Spurling attacked him because he refused to perform a contract murder. To this end, Kinsley subpoenaed all employment and/or criminal records from the Maryland State Police pertaining to Spurling, who formerly was employed as a trooper with that agency. In response, the State Police turned over no records indicating that Spurling was involved in any violent or criminal activity.

Later, after Thomas filed a petition for post conviction relief, his post conviction counsel was able to obtain from the State Police several reports about Spurling which had not been produced previously. These records indicated that the State Police had generated reports regarding Spurling after his death and prior to the date Kinsley first subpoenaed the State Police records. The records were the product of an investigation of Spurling conducted by Sergeant Charles R. Mazzone of the Internal Affairs Division of the State Police. The purpose of the investigation was to determine whether there was any connection between Spurling's murder and a theft of a large quantity of marijuana from police custody while Spurling was a trooper. The investigation disclosed that after he left the State Police, Spurling had been involved in an illegal loan sharking operation in which Spurling acted as a debt collector, and that on one occasion while so employed he broke a reluctant debtor's arm. During the post conviction hearing it was also discovered that Thomas Basham, the lead Assistant State's Attorney who prosecuted Thomas, was aware of the investigation and had spoken to Sergeant Mazzone about the investigation prior to Thomas's trial. In light of these discoveries, Thomas contends that the conduct of the State Police and Basham violated their constitutional duty to produce exculpatory evidence under *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. Thomas also asserts, as he must, that these records were material to his defense within the meaning of *Brady.*

With respect to the issue of materiality, Thomas notes that "at trial, Mr. Kinsley made the facially implausible argument that Mr. Spurling—an ex-policeman—attacked Thomas because Thomas failed to accept a murder contract that Mr. Spurling had proposed." Thomas contends that if Kinsley had seen the reports he could have pursued and developed Spurling's involvement in illegal loan sharking and his violent activities in connection with those activities. Thomas maintains that had any of these lines of inquiry borne fruit, Thomas's self-defense claim would have been

based on substantial evidence of Mr. Spurling's violent character and underworld activities rather than Thomas's seemingly implausible and self-serving testimony. As to Sarah Spurling's killing, Thomas argues that, had the State Police information been produced, the jury might have been more likely to accept his explanation that he killed her in a panicked frenzy as a result of Mr. Spurling's attack on him. We disagree.

The proper standard to apply in evaluating whether the State's failure to produce evidence pursuant to *Brady* warrants overturning a defendant's conviction is well established. Evidence is considered material, and relief is therefore appropriate, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985); *State v. Tichnell*, 306 Md. 428, 462–63, 509 A.2d 1179, 1196–97 (1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), *rehearing denied*, 479 U.S. 1060, 107 S.Ct. 942, 93 L.Ed.2d 992 (1987).[7] In the instant case, we discern no substantial possibility [8] that, had the police reports been revealed to Thomas's counsel, the result of his trial would have been any different.

The most damning information about Spurling contained in the Sergeant Mazzone's reports for the State Police was that Spurling was involved in an illegal loan sharking venture and that he was enforcing and collecting loans from people indebted to this operation. Specifically, Sergeant Mazzone wrote:

---

**7.** In *Bagley*, the Supreme Court specifically relied on the Strickland standard in reformulating the test of "materiality" for *Brady* purposes. 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494.

**8.** This standard reflects our interpretation of the "reasonable probability" language employed by the Supreme Court in *Strickland*. *Bowers v. State*, 320 Md. at 426–27, 578 A.2d at 739.

"one week prior to the murder, Trooper 1/C Jane D. Kulp had received a telephone call from Donald Spurling. He informed her that he had received a threatening telephone call from an individual known as Don Thomas, a black male, approximately 23 years old. Spurling requested that Trooper 1/C Kulp check into Thomas' background and let him know the results. No such check ever occurred, instead, Trooper 1/C Kulp simply filed her notations considering the inquiry as not legitimate. Trooper 1/C Kulp revealed that she had been a friend of Spurling and had continued to talk with him after he left the agency. She further related the contents of discussions she had with him during those months preceding the murders.

"Trooper 1/C Kulp had been informed by Donald Spurling that he had been 'roughing people up' to collect money for an individual known only as Greenie. This individual would let Spurling know a few days in advance of the identity of the individual from whom he was to collect. Spurling boasted about making $1000 from Greenie in a single week. He also mentioned a future collection job where he (Spurling) would make $1200 by roughing someone up. Spurling reportedly had been collecting for Greenie for about a year and the most severe injury he inflicted (to others) had been a broken arm. There was some indication that from time to time Greenie would loan Spurling money as the need would arise.

"On October 30, 1981, information was received from a past proven reliable informant that the individual Greenie was a white male aged in his 60's who had retired from the Teamsters Union. He lived on Southwestern Blvd., in Arbutus and frequented the Arbutus Pool Hall. Approximately one week prior to the murder, Spurling and Greenie reportedly confronted two black males while armed with a handgun and demanded money owed by them. This occurred in Baltimore City.

"On December 1, 1981, information was received from the FBI that two independent past proven reliable infor-

mants had told their agency that Greenie was the manager of the Arbutus Pool Hall and that both Donald Spurling and Donald Thomas were employed as collectors for Greenie's operation. Many of the debts resulted from gambling which occurs at a second floor room located at Pratt and Monroe Streets above what once was Mastino's Bar, in Baltimore City."

While these reports do indicate Spurling's willingness to engage in aggressive behavior, we do not believe that this evidence was sufficient to undermine confidence in the outcome of the proceeding. First, Donald Spurling's propensity to use force in collecting debts was already before the jury. Sam Houseman, a senior linesman for the Baltimore Gas and Electric Company, testified for the defense that on the night before he was killed Spurling came to his house in the company of Thomas to collect a gambling debt; when Houseman told Spurling he could not pay, Spurling initiated a fist fight and "whopped" him. Second, the reports were not admissible at trial. The reports were written by Sgt. Mazzone and contained information based upon what Donald Spurling told Trooper Kulp about Spurling's activities. The declarant, Donald Spurling, was not available to testify, and the out-of-court declarations contained in the report fall under no exceptions to the hearsay rule. Consequently, we hold that the reports were not material under *Brady* and that Thomas is not entitled to any post conviction relief because of the State's failure to produce them.

JUDGMENT GRANTING NEW SENTENCING HEARING VACATED; JUDGMENT DENYING POST CONVICTION RELIEF FROM CONVICTIONS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

ELDRIDGE, Judge, dissenting:

I would affirm the circuit court's order granting a new sentencing proceeding.

For the reasons set forth in my concurring and dissenting opinion in *Thomas v. State*, 301 Md. 294, 340–352, 483 A.2d 6, 30–36 (1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985), I believe that the record in this case demonstrates that Thomas's trial counsel's "consent" to the examination by Dr. Spodak in connection with the sentencing proceeding was invalid. To the extent that the post conviction judge found that the defendant's trial counsel was not misled in giving his consent to the examination, such finding is clearly erroneous in light of the record. Because trial counsel's consent was invalid, the admission of Dr. Spodak's testimony at the sentencing hearing violated Thomas's constitutional right to the assistance of counsel under the Supreme Court's holding in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

Assuming, however, that trial counsel's consent to the Dr. Spodak examination was not invalid, I agree with Judge Bell that trial counsel's performance was ineffective and prejudicial. For the reasons delineated in Judge Bell's dissenting opinion, with which I concur, Thomas was denied the effective assistance of counsel guaranteed by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights.

ROBERT M. BELL, Judge, dissenting.

I dissent. Contrary to the majority's reasoning in remanding this case for further proceedings, I believe *this* record is abundantly clear that petitioner's trial counsel rendered ineffective assistance of counsel to petitioner's prejudice.[1] Furthermore, as I see it, the only effect of the

---

1. The State does not seriously contend, except insofar as the argument regarding counsel's failure to attend the psychiatric interview is concerned, that counsel's conduct, if deficient, did not prejudice petitioner. In any event, the trial court's findings in that regard are quite clear, and, to my mind, amply supported by the record. *See Harris v. State*, 303 Md. 685, 699–701, 496 A.2d 1074, 1081–82 (1985). Consequently, I focus only on the deficient performance prong of the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

remand ordered by the majority is to make even more obvious how ineffective trial counsel's performance really was.

The post conviction hearing judge determined that Kinsley had rendered ineffective assistance of counsel to petitioner:

I do conclude ... that under the *Strickland v. Washington* [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] standard Mr. Kinsley was ineffective in his representation of Mr. Thomas during the sentencing phase of this case. Now, it's true Mr. Kinsley worked hard. It's true Mr. Kinsley was vigorous in his representation of Mr. Thomas. But the incompetence of counsel standard is not measured by how loud a lawyer yells or frankly by how hard the lawyer works. If a lawyer makes a big mistake, no matter how well-intentioned the lawyer is and no matter how hard the lawyer has worked, that big mistake constitutes ineffective assistance of counsel and here Mr. Kinsley made a big mistake in allowing Dr. Spodak to go unsupervised and unchaperoned down to interview Mr. Thomas, who, on the basis of Mr. Kinsley's advice to him assumed that Dr. Spodak was there to be fair and impartial. Dr. Spodak was a State's agent, interviewing the defendant to testify as a State's witness and Mr. Kinsley should not have allowed Dr. Spodak to interview Mr. Thomas without being there himself or taking other appropriate safeguards to protect Mr. Thomas' interest. Now, the State argues in the alternative, that assuming that Mr. Kinsley made a mistake, that mistake was not material to the sentence that Judge Hormes imposed in this case.

I read the testimony of Dr. Spodak, I have read the statements made by Judge Hormes when he imposed sentence in this case. I am affirmatively persuaded that the mistake Mr. Kinsley made, his error in judgment, did prejudice Mr. Thomas at that sentencing hearing. This isn't a case where I can't say one way or the other my mind is in a state of even balance. I am affirmatively

persuaded that Dr. Spodak's testimony, based upon his interview with Mr. Thomas, prejudiced Mr. Thomas at the sentencing proceeding.

Thus, it is clear that the court found ineffective assistance in counsel's allowing Dr. Spodak to interview petitioner alone. It may also be inferred from the court's reference to "other appropriate safeguards" that counsel's failure to investigate, or, at least, inquire into the purpose of the evaluation before consenting to it was itself ineffective assistance of counsel as well.[2] The court specifically did not find that the ineffective assistance of counsel was trial counsel's failure to obtain, or present, psychiatric evidence at the sentencing proceeding.[3] The court ordered a new sentencing hearing.

In its Application for Leave to Appeal,[4] *see* Maryland Code (1957, 1987 Repl.Vol.) Art. 27 § 645–I, as on appeal, the State argues that the decisions made by petitioner's counsel, to permit petitioner to be evaluated by Dr. Spodak and to permit it to be done outside his presence, were tactical decisions and, consequently, could not constitute ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984). Concerning counsel's failure to attend the interview, the State maintains that, in any event, no prejudice flowed from that fact; rather, it arose only from what Dr. Spodak was able to elicit from petitioner during the

---

**2.** Even if the reference to "other appropriate safeguards" may not be construed to relate to counsel's failure to investigate, the court may nevertheless still be right for the wrong reason. *Faulkner v. State*, 317 Md. 441, 447, 564 A.2d 785, 788 (1989); *Temoney v. State*, 290 Md. 251, 261, 429 A.2d 1018, 1023 (1981).

**3.** This point has significance when one considers the alternative position taken by the State, which position has been accepted by the majority of this Court. *See* note 6 *infra*.

**4.** Petitioner filed a cross-application for leave to appeal raising numerous issues, the merits of which the majority finds lacking. In view of the position I take with respect to the State's application, it is unnecessary that I address the cross-application. In any event, as to those issues, I have no real quarrel with the result the majority reaches.

interview.[5] Alternatively, the State contends that it was entitled to explore what counsel knew as a result of his consultation with Dr. Beran, a doctor hired by him to conduct a pretrial competency evaluation. The court's denial to it of that opportunity, the State maintains, requires vacation of its order of a new sentencing hearing. The majority finds merit in this alternative position,[6] and orders the case remanded to the circuit court for further proceedings.

Agreeing with the State's alternative contention, the majority comments:

> [i]t is clear that without Kinsley's testimony concerning his understanding of the results of Dr. Beran's examination of Thomas prior to trial, the post conviction court could not fairly or accurately determine whether Kinsley's decisions in connection with the Spodak interview were deficient under the first prong of the *Strickland*

---

5. Interestingly, the majority does not comment directly on the merits of the State's principal arguments. It may be, however, that implicit in the remand order to take additional testimony is a recognition by the majority that neither position has merit.

6. I question whether the alternative argument made by the State is properly before us. At the post conviction hearing, there was a colloquy between the court and the State concerning the admissibility of the testimony at issue. During that colloquy, the court suggested that the State did not have any burden of proof with respect to the effective assistance of counsel issue. Responding to that observation, the prosecutor stated clearly why he raised the issue despite not having the burden to do so:

> I don't shoulder the burden, but the risk by my not asking the question would be if the trial court would find that merely not hiring a psychiatrist before the sentencing phase was the ineffective assistance of counsel. If that is the conclusion that this Court would draw from that, then, of course, I would want to explore in more depth why counsel did not hire a psychiatrist, specifically Dr. Beran. If he had great things to say about Mr. Thomas, then Mr. Kinsley would have used him.

It is clear that the court made no such finding, *i.e.*, that the ineffective assistance of counsel consisted of a failure to hire a psychiatrist for the sentencing phase. Since that was the basis upon which the State sought the testimony, it seems to me to be clear that the issue raised by its alternative argument is not preserved.

test. For example, if Kinsley had been told by Dr. Beran that Thomas suffered from no mental impairment and exhibited the likelihood of future danger to society, then Kinsley's decision to allow further examination in the hope of obtaining a favorable diagnosis may well have been reasonable.

At first blush, the majority's observation has a surface—superficial—appeal. Nevertheless, with but minimal thought and analysis, its flaw soon becomes obvious.

Implicit in the majority's position is that Kinsley was aware of the purpose of the Spodak evaluation, recognized that its results would be the subject of testimony at the sentencing hearing, and, perhaps, understood the significance of the fact that Dr. Spodak would conduct it, *i.e.* that Dr. Spodak was a State agent. Given the timing of the evaluation, the fact that the State requested it, and, perhaps, the contents of the petition, one could logically assume that at least the first two considerations were obvious. The testimony by Kinsley, however, negates any such assumption. Kinsley testified that he not only did not appreciate the purpose of the evaluation or anticipate that the results of the evaluation would be testified to at the sentencing hearing, but that he thought that Dr. Spodak simply wanted to update the already completed competency examination. And, as we shall see, his testimony revealed, furthermore, that the source of his belief was certain assumptions he made: he believed that Dr. Spodak was a neutral doctor, updating petitioner's competency evaluation on behalf of Clifton T. Perkins Hospital Center, and that Dr. Spodak would not attempt to obtain information for the purpose of benefitting or adversely affecting either the State or the defense.

A determination whether a defendant has been denied effective assistance of counsel, far from being a trivial matter, is a matter "of ... fundamental importance to our system of justice." *Bowers v. State,* 320 Md. 416, 424, 578 A.2d 734, 737 (1990), citing *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 692

(1984). It is not enough "[t]hat a person who happens to be a lawyer is present at trial alongside the accused," *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d at 692, since "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763, 773, n. 14 (1970). Moreover, a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decisions," *Strickland,* 466 U.S. at 686–87, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, citing *Barclay v. Florida,* 463 U.S. 939, 952–54, 103 S.Ct. 3418, 3425–27, 77 L.Ed.2d 1134, 1145–1147 (1983); *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), that the role of counsel in both is comparable. *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Furthermore, because the role of counsel is "to ensure that the adversarial testing process works to produce a just result under the standards covering decisions", *id.,* whether counsel has rendered ineffective assistance must be determined by reference to whether his or her conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced the just result." *Id.* at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692.

When evaluating the performance of counsel to determine whether it meets the minimum standard of effectiveness, the inquiry must be whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. In other words, counsel's performance must have fallen "below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Among the functions counsel is required to perform as part of his or her duty to render effective assistance of counsel is to be an effective advocate for his or her client. [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct

on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

In *Strickland,* as in the instant case, the duty alleged to have been breached was counsel's duty to investigate. Addressing that duty, the Supreme Court stated:

Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

By Petition for Pre-sentence Psychiatric Evaluation, the State obtained a court order for the pre-sentence psychological evaluation of the petitioner by Dr. Michael Spodak. The petition the State filed, as Judge Eldridge pointed out,

in dissent, *see Thomas v. State*, 301 Md. 294, 344, 483 A.2d 6, 32 (1984), did not state, or even intimate, "that the examination and evaluation by Dr. Spodak would not be done in his capacity as a staff member of Clifton T. Perkins Hospital Center and an employee of the Department of Health and Mental Hygiene"; it implied,

> [o]n the contrary ... that Dr. Spodak would be examining and evaluating Thomas as a member of the hospital staff, as it referred to the prior evaluation "at the Clifton T. Perkins Hospital Center," referred to the hospital center's findings in the February 1982 report, referred to Dr. Spodak as one who participated in the previous Clifton T. Perkins evaluation, and stated that it is desirable to "supplement" the original evaluation.

*Id.*

The petition also indicated that the petitioner's counsel "has no objection to such an evaluation" and, indeed, at the post conviction hearing, Kinsley confirmed that this was so. What counsel did not, and, in fact, could not, explain was why he did not object to the evaluation or, more to the point, why he did not investigate the need for it.

Kinsley testified at the post conviction hearing that he thought that the evaluation the State's petition sought would be a routine kind of examination, similar to the pretrial competency examination which had been conducted at Clifton T. Perkins Hospital Center. Thus, on direct examination, Kinsley responded to a question as to why he allowed Dr. Spodak to examine his client as follows: "So, I have a clear recollection of the whole request was simply a routine psychiatric examination." He also testified that he "understood [Spodak] to be a continuing employee of the Clifton T. Perkins Hospital" and that "[Spodak] was simply going to bring whatever he wanted to bring up-to-date." The same theme was continued during cross-examination. For example, responding to the question why he did not call a psychiatrist to testify at the sentencing phase, Kinsley testified:

Because I felt sincerely that Spodak was a State of Maryland employee and he was hired initially to examine Donald Thomas at Clifton T. Perkins. I had no idea at all that Spodak was going to testify. I thought he was simply going to submit a performance-type follow-up psychiatric evaluation for the judge for the purpose of sentencing, not that he was going to come in court and testify. If I knew that, I would have wanted to have seen his written report to the State, and if I saw all of those things that he testified to at the sentencing hearing, God if I saw that, yes, I most certainly would have had a psychiatrist—the very best that money could buy.

In short, petitioner's trial counsel testified that he acquiesced in the post-trial, presentence examination of his client by Dr. Spodak, a State agent, because he "felt that Spodak was in effect our psychiatrist. He was a State employee." And because counsel believed the examination would be a mere update of the previously conducted competency examination, he felt no need to be present during the examination. Counsel's testimony, both on direct and on cross-examination, thus indicates quite clearly that his conclusion concerning the nature of the examination was a product of conjecture or speculation, rather than considered judgment; since he made no inquiry and the State provided precious little useful information, it most certainly was not the result of a reasonable investigation or analysis of the information given him by the State. The record of the post conviction hearing clearly reflects that Kinsley did not ask the State why it desired to have petitioner evaluated or what it sought to learn from the evaluation; he simply inferred, presumably as a result of the petition filed with the court, that it was simply an extension of the competency evaluation.[7]

---

7. Although the record is unclear on the timing of the objection, the trial transcript is quite clear that counsel objected, vigorously, to the testimony of Dr. Spodak. And the basis for that objection—because counsel "was under the impression that Dr. Spodak would see [petitioner] as a member of the staff of Clifton T. Perkins"—also appears

The choice made by Kinsley to allow Spodak to conduct a presentence examination of petitioner, even if a tactical or strategic choice,[8] most assuredly was not one made after a "thorough investigation of the law and facts relevant to plausible options." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Notwithstanding that his client faced the death penalty and the ease with which it could have been done, the record does not reflect that counsel asked even one question regarding the purpose of, or need for, the examination or about the capacity in which Dr. Spodak would conduct it. *Strickland* recognizes that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Assumptions made on the basis of an ambiguous record simply do not constitute "investigations," especially when a few simple questions would have clarified precisely what the situation was. *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 693–94; *Bowers,* 320 Md. at 424, 578 A.2d at 738. *See also Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305, 325–26 (1986). And a decision which renders a particular investigation unnecessary is reasonable only to the extent that it is supported by "reasonable professional judgments," given

---

clearly in the record. Furthermore, counsel stated, while objecting to Dr. Spodak's testimony, that had he known that Dr. Spodak was a State agent, an expert paid by the State, he would not have permitted access to his client and on that basis, moved to exclude Dr. Spodak's testimony.

8. It is questionable that the choice was tactical or strategic. To be strategic, there must be an understanding of the available options and of their relative merit, and/or consequences. The reasonableness or acceptability of any of those options can only be assessed by reference to the totality of the circumstances. Kinsley's testimony reveals that he considered only one "option" and, *as to it, not even the consequences of choosing it. See, e.g., People v. Bell,* 152 Ill.App.3d 1007, 106 Ill.Dec. 59, 63, 505 N.E.2d 365, 369 (1987) (counsel's failure to interview potential witnesses to determine whether their testimony would be useful to the defense theory of the case prevented the decision not to call any of them from being a tactical one).

the totality of the circumstances. When a decision is not the product of the exercise of professional judgment, only conjecture, speculation and assumption, it cannot be reasonable. The choices made by Kinsley in this case were not reasonable. His failure to investigate, *i.e.* to ask questions regarding the requested evaluation, was performance that fell *far* below any objective standard of reasonableness. So, too, was his decision to allow Dr. Spodak to conduct the examination alone. Again, counsel had no appreciation as to the significance of the examination, who was conducting it, or the use to be made of the results and without that pertinent information, it simply was unreasonable to allow one's client to be examined alone.[9]

As an advocate for petitioner, Kinsley could not reasonably have entertained any hope of obtaining a favorable psychiatric report by agreeing to a psychiatric examination without, at the least, knowing its purpose, the role of the person conducting it, and the use to be made of the results. That is particularly true when he may have been aware of adverse information, gleaned from a pretrial examination that may have addressed petitioner's future dangerousness. Counsel's knowledge of adverse information does not make it available to the State for use by the State at a sentencing proceeding.[10] Moreover, for counsel to have insured the availability of the information to the State by failing to investigate the factual circumstances surrounding the

---

**9.** Trial counsel refrained from accompanying petitioner to the interview with Spodak because he assumed it was a competency update conducted by a neutral professional; had that assumption been true, that decision may well have been appropriate. On the other hand, he should not have relied upon assumption; he should have made inquiry as to the reason for the examination, the role of the person conducting it, etc. Failing to do that, had he attended the examination, he most probably would have discovered the true state of affairs and, thus, been able to salvage the situation.

**10.** Under Maryland Rules of Professional Conduct, Rule 1.6, Confidentiality of Information, even if Kinsley knew that Dr. Beran assessed petitioner as being potentially dangerous in the future, as Dr. Spodak ultimately did, he was neither obligated, nor permitted, to reveal that fact to the court or the State.

State's request to evaluate his client simply exacerbates the extent to which counsel's representation was ineffective. It is one thing to have information which may be adverse to the interest of one's client, but it is quite another to deliver it, on a silver platter, to the advocate for the other side. That would be the precise practical effect of Kinsley's consent to the psychiatric evaluation, knowing, or, at least, with reason to know, what it would reveal. This is especially the case when the result of counsel's deficient performance may be, as here, imposition of the death penalty on counsel's client. Therefore, as I see it, the only effect of the inquiry the majority now mandates is to further demonstrate, exacerbate, if you will, the full extent of the ineffective representation rendered by Kinsley in his handling of this matter.